[Civ. Nos. 14802, 14825. First Dist., Div. One. Jan. 16, 1952.]

JOHN O. WESTON et al., Appellants, v. WILLIAM E. FOREMAN et al., Respondents.

(Two Cases.)

Wagener & Brailsford and Wm. H. Brailsford, Jr., Dreher, McLeod & Bowman and Orlando J. Bowman for Appellants.

Harry M. Gross and George Gordon for Respondents.

WOOD (Fred B.), J.—Plaintiffs appeal from two judgments rendered against them on the pleadings, in actions to enforce a building restriction which requires that no building be erected or altered until the building plans, specifications and plot plan have been approved by a certain committee. Upon stipulation of the parties, the two appeals have been consolidated for hearing before this court, and submitted upon a single set of briefs.

The sole question is whether or not the committee's life had terminated and with it the requirement for committee approval. The answer turns upon the meaning of a certain provision of a declaration of restrictions recorded June 13, 1941, by the then owners of all the lots designated upon a recorded subdivision map. The declaration stated

that three named persons composed the committee, and that "Said committee shall act and serve until January 1, 1947, at which time the then record owners of a majority of the lots which are subject to the covenants herein set forth may designate in writing duly recorded among the land records their authorized representative who thereafter shall have all of the powers, subject to the same limitations, as were previously delegated herein to the aforesaid committee."[1]

Did the committee as thus composed terminate upon January 1, 1947, despite the failure of the record owners to appoint their representative? Appellants claim it did not. Respondents claim it did.

Which of these interpretations is correct may best be ascertained by reading the disputed clause in its context. The declaration of restrictions recites that the declarants are the owners of all the lots in the subdivision, are about to sell the lots, and desire to subject the lots to the conditions, restrictions and reservations thereinafter set forth "for the benefit of said lots, and each of them, and of the present and subsequent owners thereof," except Lots 1 and 2 which are not subject to those restrictions. It then declares that the property shown on the map "is held and shall be conveyed subject to the conditions, restrictions and reservations set forth in the following clauses," consisting of 14 numbered paragraphs.

The first paragraph declares that "These covenants and restrictions are to run with the land[,] shall be binding on all the parties and all persons claiming under them until January 1, 1966, and are expressly made for the direct benefit of each and every parcel . . ." If any of the parties to the declaration, their heirs or assigns, shall violate or attempt to violate any of the covenants or restrictions, any

---

[1]The complaint in action No. 14802, filed August 3, 1950, after setting forth the declaration of restrictions and stating its purpose and effect, alleges that defendants William E. and Mrs. Foreman purchased a lot in the subdivision; that the Foremans and their agent, defendant A. Lundegren, commenced the construction of a house on said lot without first submitting plans and specifications to the committee; that later, during construction, defendants did submit plans and specifications, which were not approved for certain reasons, and are proceeding with the work of construction without committee approval; and prays for injunctive relief.

The complaint in action No. 14825, filed September 7, 1950, is the same in all material respects as the complaint in No. 14802, except that it additionally alleges that a majority of the lot owners recorded a designation of their authorized representatives on September 6, 1950, to succeed the committee originally appointed in the declaration of restrictions, and asks for damages as well as injunctive relief.

other lot owner may prosecute any proceeding at law or in equity to prevent such violation or to recover damages.

The second, fifth to eleventh, and the thirteenth paragraphs impose restrictions absolute in nature (without reference to approval or disapproval of any committee); e.g., no temporary dwellings, no slaughter house, no public garage, minimum floor area, height limitations, racial restrictions, single-family dwellings only, no hogs or goats, no livestock for profit, set-back lines, easements for utilities.

The third paragraph requires building plans and specifications and plot plans to be approved before erection or alteration, and provides a committee to do the approving. It reads as follows: "No building shall be erected, placed or altered on any building plot in this subdivision until the building plans specifications, and plot plan showing the location of such building have been approved in writing as to conformity and harmony of external design with existing structures in the subdivision, and as to location of the building with respect to topography and finished ground elevation, by a committee composed of JOHN O. WESTON, EDITH E. WESTON, and E. A. JOHNSON, or their authorized representative. In the case of the death of any member or members of said committee, the surviving members or member shall have authority to approve or desapprove such design or location. If the aforesaid committee or their authorized representative fails to approve or disapprove such design and location within 30 days after plans have been submitted to it, or if no suit to enjoin the erection of such building, or the making of such alterations has been commenced prior to the completion thereof, such approval will not be required. Said committee or their authorized representative shall act without compensation. Said committee shall act and serve until January 1, 1947 at which time the then record owners of a majority of the lots which are subject to the covenants herein set forth may designate in writing duly recorded among the land records their authorized representative who thereafter shall have all of the powers, subject to the same limitations, as were previously delegated herein to the aforesaid committee."

Paragraph four prescribes set-back lines for buildings, but authorizes deviation in respect to attached garages, with committee approval: "Excepting as otherwise provided or as controlled by law and with written approval of the Property Owner's Committee, private one-story attached garages

may be located nearer to the street line than the established building lines, but not nearer than 5 feet to any street line, where the natural grade of the lot at the established building line is more than either eight feet above or four feet below the average established roadway level of the street on which the lot abuts, on condition that the floor level of such attached garage shall be not more than one foot above the established roadway grade of the street.''

The twelfth paragraph prescribes height limits for fences, walls, and hedges, and declares that no tight board fence shall be ''erected thereon without the approval in writing of the committee referred to in paragraph Third hereof and in the manner therein required.''

The fourteenth paragraph declares that the breach of any of the foregoing restrictions shall not affect the lien of any mortgage or deed of trust made in good faith for value on the land, but such breach may be enjoined, abated, or remedied.

There can be no doubt that the declarants intended that the covenants, conditions, restrictions and reservations expressed in this declaration be effective and operative continuously until January 1, 1966. They said that in the declaration in words that admit of no doubt or equivocation.

That period of life applies automatically to the various restrictions which are absolute in character, those which operate without approval or disapproval by any person or agency.

It applies equally to every construction or alteration project which requires approval, whenever such a project is undertaken, at any time prior to January 1, 1966. Each type of such project is of a kind that may occur at any time, early or late, during that period: The erection or alteration of a building (paragraph third) ; the placing of an attached garage near a street line (paragraph fourth) ; the erection of a tight board fence (paragraph twelfth).

The requirement of approval would be futile and meaningless were there no agency in existence to do the approving, whenever the need for approval might arise. To provide such an agency was the obvious purpose of creating the committee in paragraph third. It follows that the committee so created would have continuous existence during the 25-year period unless some provision of the declaration requires a limitation thereon.

The only suggestion of a limitation appears in the disputed clause, quoted earlier in this opinion. It says that the

committee first appointed "shall act and serve until January 1, 1947." It does not say that the committee shall then cease to act or serve. It says "at which time" the record owners of a majority of the lots "may" designate "their authorized representative" who "thereafter shall have all of the powers . . . as were previously delegated herein to the aforesaid committee." ▮▮▮▮ The preposition "at" is indefinite in its meaning. In the expression "at or prior to" it may signify "within a reasonable time after" (*Estate of Clark*, 17 Cal.App.2d 323, 325-326 [61 P.2d 1221]); in the expression "at the expiration of" it may mean "*the exact moment or near* it" or "any time *after*" (*People* v. *Blanding*, 63 Cal. 333, 339), or "after" (*Ex parte Szumrak*, 278 F. 803, 810). Its meaning in each case is governed by the intent of the person using it, ascertained from the context. ▮▮▮▮ In this case, the context in which the declarants used the expression "at which time" compels the conclusion that they meant "at or after," "any time after." The words "thereafter" and "previously," as used in the disputed clause, reasonably refer to the nearest antecedent (the time the designation of an authorized representative is made), not to the more remote antecedent (the first day of January, 1947).

The reasonable intendment is that the committee act and serve at all events until January 1, 1947, and thereafter until the designation, by the lot owners, of their representative; until January 1, 1966, if no such designation be made.

Respondents base their interpretation of the disputed clause upon the established rule that restrictive covenants are to be strictly construed against limitations upon the free use of property, citing *Wing* v. *Forest Lawn Cemetery Assn.*, 15 Cal.2d 472, 479 [101 P.2d 1099, 130 A.L.R. 120], and *Werner* v. *Graham*, 181 Cal. 174, 181 [183 P. 945]. In the Wing case, a cemetery association conveyed various lots by deeds which contained restrictions of use for burial purposes only, but contained no description of a dominant tenement which was to be benefited by the restrictions, nor did the grantor by the terms of those deeds bind itself to impose similar restrictions upon lots retained by it, nor to do anything in favor of the property of the grantees. There was no reference to a common plan of restrictions and no indication that one was in existence. In the Werner case, although the owner of a tract of land inserted substantially similar restrictions in the various deeds by which he conveyed lots to the several purchasers, there was no statement in any deed that the

restrictions were for the benefit of any other lot and no declaration in writing of a common plan. Enforcement, under each deed, was vested in the grantor by a right of reverter given to or reserved in him. The mere statement of these facts demonstrates the difference between those two cases and the instant case. Here, as in *Hannula* v. *Hacienda Homes, Inc.*, 34 Cal.2d 442 [211 P.2d 302, 19 A.L.R.2d 1268], the parties "have expressed their intention to limit the use," an intention which "should be carried out, for the primary object in construing restrictive covenants, as in construing all contracts, should be to effectuate the legitimate desires of the covenanting parties" (pp. 444-445). It may be observed, also, that the declaration of restrictions under consideration does not necessarily decrease the use of the land, in view of the general plan of development in which uniformity of use is sought. Each purchaser of a lot benefits by his own promise and that of each of the other purchasers. That well may operate to increase rather than to diminish land use. (See discussion in Restatement of the Law of Property, § 526 and comment, particularly paragraph (c) of the comment.)

We have considered the suggestion that the committee appointed in the declaration of restrictions was to represent the subdividers until January 1, 1947, at which time a representative, if designated, was to represent the purchasers of individual lots. Upon the recording of the declaration, the committee (two of the subdividers and one other person) became the representative of the subdividers in the capacity of the latter as owners of lots benefited by and burdened with the restrictions, not in their individual capacity. The committee was immediately impressed with duties and responsibilities, as well as authority, toward each lot owner, to exercise its functions justly, fairly and reasonably in carrying out and effectuating the general plan of development within the framework of the declared restrictions. As lots sold, the committee's representation changed to the extent of including each new purchaser, in turn, as owner of the lot purchased. Upon paying his money and accepting the deed, he in effect joined in the original appointment, became equally interested with the subdividers, and other purchasers, in the continued functioning of the committee, now his representative as well as theirs, as lot owners. We deem significant these words of the Supreme Court in *Hannula* v. *Hacienda Homes, Inc.*, *supra*, 34 Cal.2d 442, at 445: "The

highest courts of Maryland, Massachusetts, and Pennsylvania have held restrictions valid and enforceable which were similar to the one here involved, *requiring approval of all construction by an individual or body of persons acting on behalf of other lot owners in a tract.* [Citations.]'' (Italics added.) In the Maryland and Pennsylvania cases cited, approval was vested in the subdivider; in the Massachusetts case, trustees were given the power of approval. That type of representative does not warrant the inference of an intent to terminate the approval function on January 1, 1947, nor to then suspend that function until a new designation be made, no matter how short or how long the gap might prove to be. It is quite conceivable that, upon the expiration of the indicated period, the lot owners would want the committee to continue without change in membership, if satisfied with its work, in view of the experience it had gained.[2]

We must remember, too, that we are dealing with private property rights. Each individual lot owner has his own bundle of rights. He has an interest in the adherence of other lot owners to the plan of development, for the protection and benefit of the home which he has built or hopes to build. He should not be put to the risk of delay in getting the owners of a majority of the lots to agree upon a representative, unless the language of the declaration *clearly* puts him to that risk, the intent to require committee approval having been clearly expressed. A protracted delay might well result in such a change of conditions (new houses of incongruous types, haphazardly located) as would render the major features of the plan unenforceable, the promised benefits incapable of attainment.[3] For these reasons we infer from the declaration no intent to terminate the committee function on January 1, 1947.

It follows that the judgment in each action should be reversed. In this connection we note that the copy of the declaration of restrictions pleaded in the second action (as well as that in the first) authorizes the lot owners to desig-

---

[2] The representatives designated in 1950 included the two subdividers who were on the original committee, and one purchaser. That may signify that the purchasers were well satisfied with the work of the committee or that the subdividers still owned a majority of the lots.

[3] That there has been no suspension of the committee function is, perhaps, inferable from the allegations of the complaint in each action that the plan for development and improvement has been followed and maintained from its inception, and that the plan and restrictions have been accepted, relied upon and acted upon by all interested.

nate a "representative" (singular), whereas the complaint in the second action alleges that the lot owners designated as their "representatives" three named persons. That inconsistency is not significant upon this appeal. That is for resolution in the trial court. Whether the designation made September 6, 1950, was valid or not, a committee was in existence at all times.

Each of the judgments appealed from is reversed.

Bray, J., concurred.

PETERS, P. J.—I dissent.

The majority construe the disputed clause to mean that the original committee, under the agreement, was to serve until January 1, 1947, and thereafter, until the property owners should select their representative. This construction is primarily predicated upon the belief that it was the fundamental intent of the signers of the agreement to limit the use of the property up to January 1, 1966. For this reason, it is held, the parties must have intended that a committee should be in existence at all times up until that date. This is a possible and perhaps even a reasonable construction of the agreement, but it is not the only construction, and, in my opinion, is not the most reasonable construction.

The interpretation of the restriction in question, there being no extrinsic evidence of intent, is a question of law and not of fact. For that reason I agree with the implied holding in the majority opinion that this court is not bound by the interpretation of the trial court, even though that interpretation may have been a reasonable one. (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Trubowitch* v. *Riverbank Canning Co.,* 30 Cal.2d 335, 339 [182 P.2d 182].) But the fact that the trial court has construed the provision is a factor that should be weighed together with all other factors in arriving at a construction.

Reference should be made to one other rule of law. The provision here involved is a limitation upon the free use of property. It is the established rule, mentioned in the majority opinion "that restrictive covenants are to be strictly construed against limitations upon the free use of property." (See *Wing* v. *Forest Lawn Cemetery Assn.,* 15 Cal.2d 472, 479 [101 P.2d 1099, 130 A.L.R. 120]; *Werner* v. *Graham,* 181 Cal. 174, 181 [183 P. 945].)

The majority opinion attempts to construe the words used in paragraph third and comes to the conclusion that the

controlling intent of the parties was that they wanted a committee in existence to approve plans and specifications during the entire 25-year period. Predicated on this basic premise the majority conclude that it must have been the intent of the parties that the original committee should have continuous existence during the entire 25-year period unless the property owners, after January 1, 1947, superseded the original committee by designating a new representative. This reasoning is sound only if the basic premise is sound, and, in my opinion, it is not.

Such a construction not only violates the rule that restrictive covenants are to be construed strictly against limitations on the free use of property, but completely disregards the relative positions of the contracting parties and the realities of that relationship.

The declaration of restrictions was drafted by Weston and his wife and by Stanley and his wife. It recites that they were then the owners of all the lots in question and were about to subdivide the area and sell the lots. This declaration was executed and recorded in June of 1941, before any lots were sold. By paragraph third the subdividers set up a committee of three of their own choosing—the two Westons and a Mr. Johnson—which committee, it was provided, "shall act and serve until January 1, 1947" at which time the then record owners of the property were authorized to elect their representative if they so desired. The first committee was to represent and be controlled by the subdividers; the new representative, if elected, was to represent the prospective purchasers of lots in the tract, an entirely different group of people from the subdividers and with different interests to protect. Thus, it seems quite clear to me that the agreement contemplates that the subdividers by 1947 would have sold all of the lots in the tract. The subdividers desired to retain complete control of the types of structures to be erected thereon until they had completed the subdivision, but after that date they contemplated that they would have no further interest therein. Paragraph third clearly expresses the intent to set up a committee to represent the subdividers, which committee should serve until 1947, and then the property owners, if they desired, could elect their representative to represent them. Since the property owners did not exercise this power until sometime in 1950, the conclusion seems inevitable that the restriction in question became inoperative during this three-year period, and that this was the intent

and desire of the property owners. The construction is strengthened by the fact that there is no allegation in either complaint that the subdivider's committee continued to act after January 1, 1947, and until August 10, 1950, when it purported to disapprove the plans of defendants.

For these reasons I think the construction given the agreement by the trial court was correct and should be affirmed.

Respondents' petition for a hearing by the Supreme Court was denied March 13, 1952. Carter, J., was of the opinion that the petition should be granted.