H. S. JOHNSON, Appellant,

v.

Albert DICK et al., Appellees.

No. 12872.

Court of Civil Appeals of Texas.

San Antonio.

July 6, 1955.

Grover D. Edgar, Victoria, for appellant.

Cory & Larsen, C. C. Carsner, Jr., Victoria, Herman G. Nami, San Antonio, for appellees.

NORVELL, Justice.

Plaintiff, H. S. Johnson, brought this suit to enforce certain building restrictions. Upon motion for summary judgment, the court below decreed that he take nothing against the defendants, Albert Dick, H. A. Jamison, J. O. Ford and John L. Randle. As we view the case, the substantial question involved is the authority of a contractual "architectural control committee" to set aside the building line restrictions governing the Parkwood Subdivision Addition to the City of Victoria, Texas.

The record applicable to the motion for summary judgment consists of admissions and stipulations of the parties, from which the following statement is made:

The original restrictions of the Parkview Subdivision were executed by H. A. Jamison on October 9, 1951, and are set forth in a written instrument containing some fourteen separate paragraphs which were made a part of all contracts of sales, deeds and other legal instruments whereby title and possession was divested out of Jamison and invested in another person. In the forepart of the instrument, Jamison recited that, "All of the limitations and restrictions contained herein shall extend to and include the heirs, assigns, devisees, lessees and holders of every kind of and under all who may purchase or acquire any real property in said Parkwood Subdivision from myself who expressly retain and reserve in every part, parcel, and lot in Blocks 1 to 10, inclusive, in Parkwood Subdivision, the proprietary right to the enforcement and observance of all limitations and restrictions hereinafter set forth."

Paragraphs 4, 5, 9, 10, 11 and 13 of the restrictions read as follows:

"4. No dwelling or building shall be permitted on any lot at a cost of less than Five Thousand and No/100 ($5,000.00) Dollars based upon cost levels prevailing on the date these covenants are recorded, it being the intention and purpose of the covenant to assure that all dwellings shall be of a quality of workmanship and materials substantially the same or better than that which can be produced on the date these covenants are recorded at the minimum cost stated herein for the

minimum permitted dwelling size. The ground floor area of the main structure exclusive of open porches and garages shall not be less than seven hundred square feet.

"5. No building shall be located on any lot nearer to the front lot line or nearer to the side street line than the minimum building setback lines shown on the recorded plat (25 feet and 4 feet, respectively). The maximum setback line for the main dwelling from the front lot lines shall be no more than ten (10) feet behind the minimum building setback lines shown on the recorded plat. No building shall be located nearer than four (4) feet to an interior lot line. No building shall be located on any lot nearer than five (5) feet to the rear lot line. For the purpose of this covenant, eaves, steps and open porches shall not be considered as a part of a building, provided, however, that this shall not be construed to permit any portion of a building on a lot to encroach upon another lot. * *

"9. No building shall be erected, placed, or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the architectural control committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. No fence or wall shall be erected, placed, or altered on any lot nearer to any street than the minimum building set back line unless similarly approved.

"The architectural control committee is composed of H. A. Jamison, J. O. Ford and John L. Randle, all of Victoria, Texas. A majority of the committee may designate a representative to act for it. In the event of death or resignation of any member of the committee, the remaining members shall have full authority to designate a successor. Neither the members of the committtee, nor its designated representative shall be entitled to any compensation for services performed pursuant to this covenant. At any time, the then record owners of a majority of the lots shall have the power through a duly recorded written instrument to change the membership of the committee or to withdraw from the committee or restore to it any of its powers and duties.

"The committee's approval or disapproval as required in these covenants shall be in writing. In the event the committee, or its designated representative fails to approve or disapprove within thirty days after plans and specifications have been submitted to it, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.

"10. No fence, wall hedge or shrub planting which obstructs sight lines at elevations between 2 and 6 feet above the roadways shall be placed or permitted to remain on any corner lot within the triangular area formed by the street property lines and a line connecting them at points 25 feet from the intersection of the street lines. The same sight-line limitations shall apply on any lot within 10 feet from the intersection of a street property line with the edge of a driveway. No tree shall be permitted to remain within such distances of such intersections unless the foliage line is maintained at sufficient height to prevent obstruction of such sight lines.

"11. These covenants are to run with the land, shall be binding on all the parties and all persons claiming under them, until November, 1976, at which time said covenants shall be automatically extended for successive periods of ten (10) years unless by a vote of the owners of title to the majority of the lots in this subdivision, it

is agreed to change the said covenants in whole or in part, which agreement to change the covenants in whole or in part shall be effected by filing the same for record in the Deed Records of Victoria County, Texas, at least one (1) year prior to the expiration of the twenty-five (25) year or ten (10) year periods thereafter. * * *

"13. If the party hereto shall violate or attempt to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated in this subdivision to prosecute any proceedings at law or in equity against the person violating or attempting to violate any such covenants, and either to prevent him from so doing or to recover damages or other dues from such violation."

On January 10, 1952, the Victoria Real Estate Company, a Texas Corporation, and J. O. Ford and wife, Lena Ford, as the owners of all the unimproved lots of the Parkwood Subdivision at that date, adopted an amended set of restrictions relating to such lots. It was provided that, except as expressly set forth, all the "provisions, covenants, restrictions and limitations set forth in the restrictions dated October 9th, 1951, placed upon said Parkwood Subdivision by H. A. Jamison * * * (were) fully ratified and confirmed." Among the lots listed in this amended set of restrictions, as unsold and unimproved, were Lot 19, in Block 4, afterwards sold to plaintiff, H. S. Johnson, and Lots 1, 2, 13, 14 and 15 in Block 4, afterwards sold to defendant Albert Dick. With certain designated exceptions, each and all of the unsold lots covered by the amendment, including Lot 19, Block 4, were restricted to single dwelling, one family units. Lots 1, 2, 13 and 14 in Block 4, were among the exceptions to the single dwelling, one-family unit provision. As to these and other designated lots, the amendment simply provided that they "may be used for commercial purposes." Such lots were not, however, expressly excepted from the minimum setback lines of Paragraph 5 of the original restrictions.

The plaintiff, Johnson, acquired Lot 19, Block 4, on July 11, 1952. The defendant Albert Dick acquired his lots in January of 1954, and on July 19, 1954, received a written instrument signed by H. A. Jamison, J. O. Ford and John L. Randle, acting as the architectural control committee of the Parkwood Subdivision, purporting to allow him to construct a building on Lots 1, 2, 13 and 14 of Block 4, without conforming to the minimum setback lines established by paragraph 5 of the original restrictions. This instrument recites that "Albert Dick is desirous of building a commercial building * * * which building would be nearer to the street than the minimum setback line, * * *" and approved "the location of such building and the walls thereof as set forth on such plan (submitted by Dick) which is nearer to Rosebud Avenue in said Parkwood Subdivision than the minimum building setback line as shown on the recorded plat of Parkwood Subdivision, insofar as authority is vested in us as the architectural control committee of Parkwood Subdivision, in paragraph No. Nine (9) of the above referred to restrictions and conditions, dated October 9, 1951, to approve such construction plans, specifications and location of buildings and walls."

It was Dick's intention to operate a grocery super-market upon his lots. The proposed building, according to the plans, would extend across the inside lines of Lots Nos. 1, 2, 13 and 14, while a limited use would be made of Lot No. 15, which latter lot was not placed within the exception permitting a use for "commercial purposes." This proposed construction was protested by Johnson, who thereafter filed suit to enjoin a violation of the offset building lines with the result indicated.

It is conceded that the construction of the proposed building would violate the provisions of Paragraph 5 of the original restrictions. This raises two questions: First, Do the provisions of said Paragraph 5 have application to Lots 1, 2, 13 and 14 in Block 4? and, second, if such provisions are applicable, does the architectural control committee have the authority to disre-

gard and set them aside over the objection of one who has purchased property within the restricted subdivision?

The original restrictions do not explicitly limit the use of the lots in the subdivision to dwelling houses. The words dwelling and building are sometimes used in the alternative and occasionally as synonyms. The amendment explicitly uses the term, "single dwelling, one family unit." The exception to this provision as to use reads, "save and except that * * * Lots One (1) and Two (2) and Thirteen (13) and Fourteen (14) in Block Four (4) * * *, may be used for commercial purposes." No definition of commercial purposes is given and no reference to Paragraph 5 of the original restrictions is made, other than a general reference to the effect that except as set forth in the amendment, all other provisions set forth in the original restrictions are "fully ratified, approved and confirmed."

■ We conclude, therefore, that the restrictions of Paragraph 5 of the original instrument were carried forward by the amendment and were applicable to Lots 1, 2, 13 and 14 in Block 4. The mere designation of these lots for commercial use and nothing more, could not operate to relieve them of the building setback line restrictions. This Court can not make contracts for parties nor by inference set aside definite contractual obligations upon which property rights are based. Nor may we by implication import something into a written instrument because it might seem that the agreement unless amended might be unwise or improvident and appear to operate unjustly. Danciger Oil & Refining Co. of Texas v. Powell, 137 Tex. 484, 154 S.W.2d 632, 137 A.L.R. 408. Restrictions must be enforced as written and cannot be changed or annulled by construction and unwarranted implications. Johnson v. Wellborn, Tex.Civ.App., 181 S.W.2d 839; Crump v. Perryman, Tex.Civ.App., 193 S. W.2d 233; 3 Tex.Jur. 10 yr. Supp. 606, Covenants and Conditions, § 93a.

■ Nor do we believe the architectural control committee was authorized to set aside and annul the provisions of said Paragraph 5 of the original restrictions. This committee is purely a creature of contract, and possesses only such authority as may be found in the written instrument creating it. From a consideration of the pertinent provisions of the document as a whole, it appears that this committee is an executive or enforcing authority with fact finding powers. While it is authorized to determine whether or not a proposed structure complies with the general scheme of development adopted for the subdivision, it is not empowered to write new restrictive covenants or limitations, nor to cancel out and obliterate existing ones. Paragraph 11 of the original restrictions specifically vests the power to change the terms of the restrictions after 1976, with the owners of the majority of the lands in the subdivision. Until said date it is specifically provided that the "covenants are to run with the land (and) shall be binding on all the parties and all persons claiming under them."

■ As the source of its asserted authority to set aside the restrictions of Paragraph 5, relating to buildings, we are referred to the sentence in Paragraph 9, which says that, "No fence or *wall* shall be erected, placed, or altered on any lot nearer to any street than the minimum setback line, unless similarly approved." This sentence does not refer to a building, nor does the word "wall" contained therein comprehend the wall of a building, but rather a wall which is in the nature of a fence. This is demonstrated by the context in which the word is used. 17 C.J.S., Contracts, § 300, p. 717. A similar connotation is found in Paragraph 10, where the phrase, "No fence, wall hedge or shrub planting which obstructs sight lines * * *," occurs, and "it is a familiar rule that, other things being equal, words used in a certain sense in one part of an instrument are deemed to have been used in the same sense in another." 12 Am.Jur. 761, Contracts, § 236. Ordinarily, a wall is not considered as a building within the meaning of the term usually employed in restrictive covenants, 14 Am.Jur. 641,

Walls, § 288, Annotation 49 A.L.R. 1364, and in the clause here involved the word was not used to mean a building.

While not specifically urged in the motion for summary judgment, appellees now contend that Johnson had no legal capacity to bring the suit, because H. A. Jamison had reserved "the proprietary right to the enforcement and observance of all limitations and restrictions" set forth in the instrument executed by him on October 9, 1951. However, this provision, set forth at the beginning of the list of restrictions, must be construed in connection with Paragraph 13 of the instrument, which, despite a certain verbal awkwardness, provides that any owner of land within the subdivision may "prosecute any proceedings at law or in equity against the person violating or attempting to violate any such covenants." It reasonably appears that the restrictions involved were not made for the sole benefit of the promoter of the subdivision, but that the general scheme or plan for the development of the tract evidenced thereby was for the benefit of those purchasing from or holding under Jamison. As such an owner, Johnson was clearly entitled to maintain the suit. Curlee v. Walker, 112 Tex. 40, 244 S.W. 497; Hooper v. Lottman, Tex.Civ.App., 171 S.W. 270; Faubian v. Busch, Tex.Civ.App., 240 S.W. 2d 361.

It was contended in the motion for summary judgment that Johnson had lost his right to maintain a suit by waiver, laches and estoppel, but the admissions relied upon to support these contentions do not show such asserted waiver, etc., as a matter of law.

Appellee Dick, as the moving party below, failed to show that there was no genuine issue of fact in the case, and the trial court erred in granting his motion for summary judgment.

Accordingly, the judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.