Tracey JOHNSON et ux., Appellants,

v.

John D. LINTON et ux., Appellees.

No. 18044.

Court of Civil Appeals of Texas, Dallas.

Feb. 15, 1973.

Rehearing Denied March 8, 1973.

J. Christopher Bird, Geary, Brice, Barron & Stahl, Dallas, for appellants.

H. Louis Nichols, Robert L. Dillard, III, Saner, Jack, Sallinger & Nichols, Dallas, for appellees.

CLAUDE WILLIAMS, Chief Justice.

John D. Linton and wife brought this action against Tracey Johnson and wife seeking to have the court declare and interpret the effect of certain restrictive covenants on a residential subdivision in Dallas. The Lintons prayed that in the event the court found that the Johnsons are in violation of the restrictions and covenants that a permanent injunction be issued restraining such transgressions. The trial

court, sitting without a jury, found that the Johnsons had violated the restrictions and issued a permanent injunction. We reverse.

## FACTS

On March 15, 1956 Northwood Terrace Homes, Inc., acting by and through its president, Robert A. Saylor, prepared and filed restrictive covenants covering the real property located in Dallas County and known as "Northwood Terrace." At that time Northwood Terrace Homes, Inc., was the owner of all of the property located within the designated area which consisted of forty-two or forty-three lots. In the instrument it was specifically provided that "these covenants are to run with the land and shall be binding on all parties and all persons claiming under them until March 1, 1984 * * *." It was also provided that in the event of a violation of any of the covenants the corporation, or any other person owning any of the real property described, may file a suit in law or in equity against the persons violating or attempting to violate such covenants to prevent them from doing so or to recover damages for such violations.

Paragraph 1 of the instrument provided that all lots in the tracts shall be known and described as residential lots and that all structures should be private residences and necessary servants' houses, garages and outhouses. It was provided: "All of such dwellings and outhouses shall not exceed one and one-half (1-½) story in height."

Paragraph 6 provided: "All garages must be not less than two car size * * * and shall be attached to the main dwelling."

Paragraph 12 provides: "No building shall be erected, placed or altered on any building plot in this subdivision until the building plans, specifications and plot plan showing the location of such building have been approved in writing as to conformity

and harmony of external design with existing structures in the subdivision, and as to location of the building with respect to topography and finished ground elevation, by a committee to be selected by this Corporation."

Robert A. Saylor was appointed by Northwood Terrace Homes, Inc., as the architectural committee provided for in Paragraph 12. He lives on Hughes Lane, three doors north of the residence occupied by appellants and four doors north of the residence occupied by appellees.

The Johnsons owned the lot known as 13731 Hughes Lane which was adjacent to the lot owned by the Lintons. The Johnsons, being desirous of remodeling and adding on to their property, had plans drawn to be utilized in such remodeling program. Copies of these proposed plans were attached to Linton's original petition for declaratory judgment and injunction and each shows upon its face that it was approved in writing by Mr. Saylor.

Tracey Johnson testified that prior to remodeling his home he was aware of the restrictions and accordingly prepared plans and submitted them to Mr. Saylor as provided in Paragraph 12 of such restrictions. He said that Mr. Saylor approved the plans whereupon he began the remodeling which consisted of removing a portion of the roof covering his garage. He constructed a stairway within the garage area, adjacent to a wall, to provide access to the area above. He said the new addition above the garage was a one-half story containing two rooms and a bath.

Mr. Saylor testified that he had always been the architectural committee provided for in Paragraph 12 of the restrictions and had, from time to time, at the request of various owners of the lots in the subdivision, examined and approved plans for residential construction. He said that he had approved the plans submitted to him by Mr. Linton when he built his home on the lot next door to the Johnsons. He said that Mr. Tracey Johnson submitted to him

plans for remodeling over his garage and that after carefully examining the same he approved them in writing. Specifically, he stated that in his opinion the Johnson plans for remodeling did not violate any of the provisions of Paragraphs 1, 6 or 12 of the deed restrictions.

On cross-examination Mr. Saylor stated that the corporation which had originally owned the subdivision, and which had prepared the restrictive covenants, had gone out of existence two or three years after it was formed. At the time the corporation went out of existence there were only a few houses built in the addition. Mr. Saylor acquired the remaining lots in the subdivision and continued to act as architectural committee after the corporation went out of existence. He said that he did this because he was the owner of the remaining lots and intended to sell them. In reviewing the plans submitted to him Saylor said that he utilized his experience over a period of thirty-two years in the real estate business and attempted to exercise his best judgment in either approving or disapproving the plans submitted to him. He had built homes for twelve years and also by virtue of real estate investments had studied plans and consulted with architects which had given him a grasp of the common terminology used among real estate people. He said that Johnson's house, as recently remodeled, was a one and one-half story dwelling and not a two-story dwelling as contended by Linton. He said his interpretation of what is meant by a one and one-half story building was consistent with the general rule of real estate practice and builders, according to his knowledge. As to the provision of a "two car garage" he thought that this meant a structure capable of housing the owner's two licensed motor vehicles.

Jack Sullivan, a Dallas building inspector, with more than seventeen years experience in building construction, testified that the only definition of a one and one-half story house he had knowledge of was contained in a Dallas zoning ordinance which had been in effect from 1947 to 1965. According to this ordinance a half story is a story having an average height of not more than eight feet, covering a floor area of not more than 25 per cent of the area of the floor of the first story below. He said that the city ordinance referred to was no longer in effect and at the present time he knew of no definition in the building code or the zoning ordinances of the City of Dallas which would specifically say how high a one-half story would be. Based upon his experience and his knowledge of the business he considered the Johnson home to be below the height which he considered to constitute an ordinary one and one-half story house.

Curtis Inglis, a graduate architect with experience in the architectural field, testified that he had inspected the Johnson property after it had been remodeled and that in his opinion the remodeled house was within his definition of a one and one-half story house. He said he based his definition upon FHA standards. He said that a one and one-half story definition would not include feet and inches and that the height of a one and one-half story dwelling would vary.

Ed Beran, the only architectural witness produced by appellee Linton, did not give a definition or verbal explanation of a one and one-half story house. He gave as his opinion that the Johnson house, as remodeled, was actually a two-story house and based this upon the fact that the improvements were "not contained partially or wholly within the existing roof * * *." He also said that the fact that it had full height walls to the plate line, being the top of the ceiling, would also make it a two story house. He said he based his opinion upon an architectural book or manual. Such book or manual was never introduced into evidence. He conceded, upon cross-examination, that all one and one-half story dwellings, under his conception, are not of the same height. He contended that a "two car garage" would consist of 20 by 24 feet dimensions but that you can "get by

with some less." When Johnson purchased his home the garage measured 21 feet by 19 feet.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court made findings of fact that the improvements constructed by appellants constitute a dwelling in excess of one and a half stories in height; that the garage was less than two car size; that appellants' dwelling was altered so as not to be in conformity and harmony of external design with existing structures in the subdivision and that such improvements placed upon the property could be removed or altered without substantial damage to appellants' dwelling. The court concluded that the restrictions are valid and may be enforced by injunction; that appellants had violated the deed restrictions contained in Paragraphs 1, 6 and 12, and that appellees are entitled to an injunction enjoining appellants from maintaining the remodeled structure.

Responding to request by appellants the trial court, in "Additional Findings of Fact and Conclusions of Law" declined to make additional findings as requested but did find as a fact that the plans submitted by appellants were approved by Saylor but that the evidence does not support a finding that he was the recognized architectural committee selected by Northwood Terrace Homes, Inc. The court also concluded that the phrases "shall not exceed one and one-half stories in height" and "all garages must be not less than two car size" are not ambiguous. The court concluded that: "Where the facts support such findings, the Architectural Committee, pursuant to Paragraph 12 of the applicable Deed Restrictions, has the fact finding powers to determine whether a proposed structure complies with the harmony and conformity of Northwood Terrace Addition, but the Court concludes that there is no evidence to support such finding in this case."

## THE JUDGMENT

In his final judgment the trial court found that the Johnsons were in violation of the deed restrictions and issued a permanent and perpetual injunction against them from erecting and maintaining a distinct second story over the garage of their residence which is "not in conformity and harmony with existing structures in the subdivision." The judgment concluded by ordering appellants, on or before 180 days, to remove and alter the second story over the garage so that the same will be in conformity and harmony with existing structures of the subdivision, and to restore the garage to a two car size garage.

## EVIDENCE ON MOTION FOR NEW TRIAL

The Johnsons asked, and obtained permission, to present evidence to the court in support of their motion for new trial. Johnson testified that he was desirous of doing what he could to comply with the court's mandatory injunction and to that end had employed another architect, John Mullin, to make a prospective and proposal so that the remodeled premises would be in conformity with the court's decree. He also testified that he had attempted to conform the garage to the court's decree by removing a work bench and some materials from the garage, and otherwise cleaning it out, so that, according to photographs introduced in evidence, there was ample room for the parking of a Pontiac station wagon and a Mercedes automobile in said garage. A photograph also reveals the stairway in the garage area leading to the rooms above and same appears to be located in such a position that it does not prevent the proper parking of automobiles in the garage.

Architect Mullin testified that the administration of architectural controls through deed restrictions "delves into the area of haste and design; therefore, we have found to effectively administrate in an equitable manner, which is the intention

of our restrictions, we have limited our design to the selection of materials." It was his opinion that by changing the materials on the side of the addition to the Johnson house with roof-like shingles it would result in architectural conformance with the subdivision generally. He said that there was no necessity to tear down the addition to the house in order to make same conform to the other structures in the neighborhood.

At the conclusion of the hearing the trial court overruled Johnson's motion for new trial.

## OPINION

In their first two points on appeal appellants contend that the trial court erred in rendering judgment against them on the theory that they had violated Paragraphs 1, 6 and 12 of the restrictive covenants because the undisputed evidence established that they had obtained prior written approval of the remodeling plans from the recognized architectural committee of the subdivision. They also attack the trial court's findings of fact that the evidence does not support a finding that Mr. Saylor was the recognized architectural committee.

The record is quite clear that Paragraph 12 of the restrictions under consideration is specific and definite in requiring prior approval of plans and specifications for buildings in the area by a committee to be selected by the corporation that formerly owned the land contained in the subdivision. There is no controversy in this record but that Mr. Saylor was the duly appointed committee; that he served during the life of the corporation; and that he continued to serve in such capacity and was generally recognized by property owners as the committee referred to in Paragraph 12 of the restrictions, after the corporation ceased to exist. Even appellees recognized this fact by securing Saylor's approval of their plans and specifications prior to construction of their own home. Other homeowners did the same. Appel-

lees do not take the position or advance the contention that Saylor's decision in approving Johnson's plans and specifications was either arbitrary or capricious. In this state of the record the question is not whether appellants actually obtained prior consent of an architectural committee, which they admittedly did, but whether such committee was clothed with authority to approve such plans and specifications.

Very little has been written in Texas concerning the operation and power of an architectural control committee such as established in Paragraph 12 of the restrictive covenants now before us. The court in Johnson v. Dick, 281 S.W.2d 171 (Tex. Civ.App., San Antonio 1955 no writ), considered a somewhat similar architectural control committee which was clothed with authority to pass upon the quality of workmanship and materials in "harmony of external design with existing structures * * *." The court approved such a committee stating that the same should act in an executive or enforcing authority capacity with fact finding powers and being authorized to determine whether or not a proposed structure complied with the general scheme of development adopted for the subdivision. However, the court also pointed out that such a committee was not empowered to write new restrictive covenants or limitations, nor to cancel out or obliterate existing ones.

In Thornton v. Wings of Faith Tabernacle, Inc., 290 S.W.2d 572 (Tex.Civ.App., Amarillo 1956, writ ref'd n. r. e.), and Kent v. Smith, 410 S.W.2d 833 (Tex.Civ. App., Tyler 1967, no writ), the courts held that the deed restrictions must be read and considered together and that in the event any doubt or uncertainty existed, coupled with the committee approval of the intended property use, such doubts were to be resolved in favor of the committee approved property use.

See also a discussion of the question of architectural committees in "Validity and Construction of Restrictive Covenant Re-

quiring Consent to Construction on Lot," 40 A.L.R.3d 864 (1971).

Appellees rely upon the fact that Saylor was not acting as the building committee of the corporation and therefore his actions in approving the plans and specifications tendered by the Johnsons was of no force and effect and cannot be said to amount to compliance with the provisions of Paragraph 12 of the restrictions. Appellees cite no cases in support of their contention.

■ The interesting question of the legal status of an architectural committee has not been decided by Texas courts so far as we are able to determine. However, after careful analysis of the factual situation here presented in the light of the provisions of the restrictions relied upon by appellees we are of the opinion, and so hold, that Saylor's authority and power to act as the architectural committee referred to in Paragraph 12 was not conditioned upon continued existence of Northwood Terrace Homes, Inc., and therefore when said corporation went out of existence Saylor's authority did not thereby terminate. Logic and reason dictate this conclusion. The restrictive covenants are to run with the land so that it is only reasonable that the machinery set up in the restrictive covenants concerning approval of plans by a committee must likewise continue to parallel the duration of the covenants, regardless of the dissolution of the corporation, the original grantor. If such were not the case the dissolution of the original corporate subdivider thereby automatically dissolves the architectural committee and results in a determination that Paragraph 12 is a personal covenant in favor of the original corporate subdivider. This is entirely inconsistent with the concept that these covenants are those that do run with the land.

While we are unable to find any Texas decisions on this question we are persuaded by the reasoning of cases from other jurisdictions.

In Bramwell v. Kuhle, 183 Cal.App.2d 767, 6 Cal.Rptr. 839 (Cal.Civ.App.1960), the court had before it a case where the restrictive covenants had been prepared and recorded by the original owner/subdivider provided for the appointment of an architectural committee by such owner/subdivider. Subsequently the owner/subdivider disposed of all of the subdivided land and was no longer interested in such area. The case arose when the defendant, having received express disapproval of construction plans from the appointed architectural committee, sought and received express approval of his plans from the original owner/subdivider. The trial court held that upon the appointment of a committee and its assuming to act, the power and authority to pass upon plans and specifications became vested in the committee and was no longer vested in the subdividers. The court further held that the original subdividers no longer had authority to approve or disapprove those plans for the reason that the authority was then vested in a duly authorized committee. The court concluded that such committee could act for the purpose designated even after the subdivider had disposed of his entire interest in the subdivision. Upon appeal the court affirmed the trial court's holding and thereby established a valid theory that the authority of the architectural committee did not cease upon the dissolution of the original subdivider but continued for the benefit of owners of the property.

In Weston v. Foreman, 108 Cal.App.2d 686, 239 P.2d 513 (1952), the court expressly holds that such architectural committee does not lose its power upon the expiration of the original owner/subdivider. The court pointed out that upon recording of the declaration of restrictive covenants the committee became the representative of the subdividers in the capacity of the latter as owners of lots benefited by and burdened with the restrictions and not in their individual capacity. "The committee was immediately impressed with duties and responsibilities, as well as authority, toward

each lot owner, to exercise its functions justly, fairly and reasonably in carrying out and effectuating the general plan of development within the framework of the declared restrictions. As lots sold, the committee's representation changed to the extent of including each new purchaser, in turn, as owner of the lots purchased. Upon paying his money and accepting the deed, he in effect joined in the original appointment, became equally interested with the subdividers, and other purchasers, in the continued functioning of the committee, now his representative as well as theirs, as lot owners."

Answering the questions here presented the court concluded that the requirement of approval by the architectural committee would be futile and meaningless were there no architectural committee in existence to do the approving, whenever the need for approval might arise; and to provide such a continuing architectural committee was the obvious purpose of creating the architectural committee in the third paragraph of the restrictive covenants.

We think the logic and reasoning of these cases is inescapable and should have application to this case. To hold otherwise would result in a vacuum of authority and would have the effect of rendering the terms of Paragraph 12 of the restrictions inoperative even though same purport to run with the land.

We are quite impressed with Saylor's testimony, especially since he was the main developer of the subdivision from the very beginning, lives and resides in the immediate neighborhood of both appellants and appellees and was thoroughly familiar with every lot and every dwelling within the addition. It is unreasonable to assume that Saylor would approve plans for an alteration which would have violated the very restrictions he caused to be drafted and thereby diminish property values in his own neighborhood. Saylor himself assumed the role of the prior corporation which had ceased to exist and it is reasonable to assume that he continued to act not

only with his previously granted authority but with the continuing authority of the subsequent owners of the lots. Under such conditions we believe that appellants exercised that kind and degree of prudence that would have been exercised by an ordinary property owner in the subdivision by proceeding to obtain Saylor's ratification and approval of the proposed remodeling plans.

There is another and compelling reason for the necessity of clothing the architectural committee with authority to act for the various property owners in passing upon the covenants which run with the land. As pointed out by the appellants, and is so aptly illustrated by a mere reading of the same, the various phrases used in the restrictions such as "story and a half" and "two car garage" as well as "conformity and harmony of external design" are vague, indefinite, and necessarily require interpretation by some designated authority. This authority must of necessity be given to the architectural committee to act as a fact finding executive and thereby carry out the express purposes of the covenants themselves.

Accordingly, we sustain appellants' points 1 and 2 and hold that the approval of the architectural committee of the plans and specifications produced by appellants prior to the remodeling of their residence constituted a compliance with restrictive covenants contained in Paragraph 12.

■ While we are convinced of the correctness of our decision in sustaining points 1 and 2, and only in the event that it should be held that Saylor, as the architectural committee, lacked authority to approve the plans and specifications tendered by Johnson, we agree with appellants, as stated in their third through seventh points of error, that the phrases "shall not exceed one and one-half story in height"; "all garages must be not less than two car size" and "conformity and harmony of external design with existing structures in the subdivision" are ambiguous, as a matter of law, and that the trial court erred in refus-

ing to hold said phrases to be ambiguous and to construe them by resolving any doubt in favor of appellants' free use of their premises.

The vagueness and uncertainty of meaning of the phrases is classically illustrated by the testimony of the various experts summarized above. Each expert in the field of architectural design had his own idea and conception of what was meant by the phrases utilized in the restrictions.

Our Supreme Court in Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951), has provided us with the most enlightening guide in the determination of ambiguity. There the court said:

> " * * * if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous."

Many other courts have discussed the question of ambiguity. McDougal v. Conn, 195 S.W. 627 (Tex.Civ.App., Beaumont 1917); Baker v. Henderson, 137 Tex. 266, 153 S.W.2d 465 (Tex.Com.App.1941); Tom v. Roberson, 182 S.W. 698 (Tex.Civ. App., El Paso 1916, writ ref'd); San Antonio Life Ins. Co. v. Griffith, 185 S.W. 335 (Tex.Civ.App., Fort Worth 1916); and Sumerlin v. Cox, 344 S.W.2d 742 (Tex. Civ.App., Eastland 1961, writ ref'd).

When we apply the rule announced in *Daniel* can we say that the questioned phrases contained in the restrictive recitations are so clear that but one reasonable meaning for each respective phrase has clearly emerged? The mere reading of the phrases themselves and the reading of the testimony of the experts who attempted to define the same answers the question in the negative.

■ Should it be decided that the architectural committee was not clothed with authority to construe these restrictions and apply the same as was done by Mr. Saylor,

then in that event the trial court, being faced with ambiguous language, was required by law to construe each phrase in such a manner strictly against appellees who sought the enforcement of said restrictions. It has long been a settled law of this state that restrictive clauses in instruments concerning real estate must be construed strictly against the person seeking their enforcement, and all doubts should be resolved in favor of the free and unrestricted use of the premises by the owner thereof. MacDonald v. Painter, 441 S.W.2d 179 (Tex.Sup.1969), and cases therein cited.

While we have held that our holdings in connection with appellants' points 1 and 2 are sufficient to reverse the trial court's judgment we also hold, in the alternative, that appellants' points 3 through 7 inclusive, should be sustained.

■ For the reasons stated above we also sustain appellants' fourteenth point of error in which they contend that the trial court's injunction is so vague, uncertain and ambiguous in its terms that it fails to comply with the mandatory requirements of Rule 683, Texas Rules of Civil Procedure. Appellants argue that they cannot reasonably ascertain from the wording of the injunctive order what they must do or not do to satisfy the court's mandate. The court's decree, by using the three disputed phrases, discussed above, and by refusing to define for appellants what he meant by such phrases, has obviously failed to meet the requirement of specificity demanded by the rule. Board of Equalization of City of Plano v. Wells, 473 S.W.2d 88, 91 (Tex. Civ.App., Dallas 1971); Eastex Wildlife Conservation Ass'n v. Jasper, 450 S.W.2d 904 (Tex.Civ.App., Beaumont 1970); and Smith v. State of Texas, 450 S.W.2d 393 (Tex.Civ.App., Austin 1970).

In their points 8, 9, 10 and 11 appellants present questions of waiver, estoppel and failure to appellees to prove irreparable injury. We have carefully considered each of these points and overrule same.

In view of our disposition of the primary points heretofore discussed we find it unnecessary to comment or pass upon appellants' points 12 and 13 dealing with the matter of balancing of equities.

The judgment of the trial court is reversed and judgment is here rendered that appellants are decreed not to be in violation of the restrictive covenants referred to in appellees' original petition. Appellees are denied their prayer for injunctive relief against appellants and the injunction issued by the trial court is dissolved.

Reversed and rendered.