Clinton MANGES et al., Appellants,

v.

R. B. WILLOUGHBY et ux., Appellees.

No. 15246.

Court of Civil Appeals of Texas,
San Antonio.

Jan. 16, 1974.

Rehearings Denied Feb. 13, 1974.

William C. Church, Jr., San Antonio, David R. White, Uvalde, Petry & Petry, J. C. Tatum, III, (on appeal) Carizzo Springs, for appellants.

Ernest Morgan, San Marcos, for appellees.

BARROW, Chief Justice.

This is a dual appeal from a judgment rendered on a jury verdict whereby appellees, R. B. Willoughby and wife, recovered a joint and several judgment in the sum of $17,956, less an escrow deposit of $4,105.78, from appellant, Clinton Manges, and appellant, Harry I. Neuman, for breach of a written lease contract.

On November 1, 1963, appellees entered into a written agreement with Neuman [1] whereby appellees' 1,002-acre farm in Zavala County was leased for a term of five years for an agreed rental of $25,000 per year. Lessee agreed, among other covenants, to deliver said premises and improvements to lessor in as good a condition as when received, natural wear and depreciation alone expected. Lessee specifically agreed to prevent Johnson grass from spreading on the leased premises. On September 23, 1966, Neuman, as sublessor, entered into a written assignment and sublease with Manges, as sublessee, whereby Neuman subleased, sublet and assigned to Manges all of his right, title and interest in the Willoughby lease contract. The original lease contract prohibited an assignment or sublease without the written consent of lessor. However, Willoughby ex ux. gave such written consent after certain considerations were met, including the deposit of $5,000 in escrow with the First State Bank

---

1. John G. Schonher and Harry I. Neuman both signed the lease; however, Schonher dropped out of the venture shortly thereafter, and no relief is sought against him in this suit.

of Uvalde to insure lessor against damage of said property.[2] Furthermore, Willoughby et ux. specifically refused to release Neuman from his obligations under the original lease contract.

At the termination of the five-year lease contract, the leased premises were returned to lessors, Willoughby et ux. Lessors asserted to the Uvalde bank that the escrow deposit should be given to them because the property had been returned in a damaged condition. Manges also asserted claim to said escrow deposit; whereupon, the bank brought this suit in the nature of an interpleader action to determine the owner of said sum. Willoughby et ux. asserted a cross-action against Manges and Neuman, seeking to recover jointly and severally for damages in the total amount of $24,652.75. Neuman denied any liability to Willoughby et ux. and affirmatively sought indemnity from Manges for any such liability. Manges denied any liability to Willoughby et ux., but sought no affirmative relief other than return of his escrow deposit.

Twenty-seven issues were submitted to the jury and all relate to the question of damages and the time same occurred. Each alleged item of damage was submitted in a somewhat similar cluster, whereby the jury was asked to find if Neuman or Manges, or their respective agents, employees or permittees, inflicted such alleged item of damage; if so, inquiry was then made as to whether same occurred after September 23, 1966; and then the cost of repairs necessary to restore the property to the condition it should have been in on November 1, 1968.[3] The jury found substantially as follows:

1. The main dwelling house was damaged and the cost of reasonable and necessary repairs was $1,143.

2. Certain fences were removed without permission and the cost to replace same was $8,050.

3. Culverts or ditch crossings were damaged and the cost of repairs was $375.

4. The farm was permitted to become infested with Johnson grass and the cost to eradicate same was $4,394.

5. Contour borders on the farm were damaged and the cost of repairs was $3,994.

In response to issues submitted after each item of damage, the jury answered in the negative as to whether any of such items of damage occurred after September 23, 1966. Other items of damage were inquired about, but appellees make no complaint to the negative findings on same.

All parties asserted at the trial, and also assert on this appeal, that the instruments in question are clear and unambiguous;

---

2. The deposit was made as follows: Manges deposited $2,500; Neuman deposited $1,250; and the All American Realty, Inc., deposited $1,250. Although the latter was made a party, its interest in the lease was not shown, and no party has complained of that part of the judgment whereby said sum of $1,250, plus interest, was ordered returned to All American Realty, Inc.

3. Each item of damage was submitted in substantially the following form as the first cluster of issues:

"*Special Issue No. 1.* Do you find from a preponderance of the evidence that the defendants, Newman on Manges, or their respective agents, employees, or any persons on the premises with the permission of either of them, injured or damaged screen doors, window screens, door locks, inside molding, windows, wooden doors, ceiling, or inside walls of main dwelling house on the Willoughby Farm during the period from November 1, 1963 through October 31, 1968? Answer 'yes' or 'no'. Answer: Yes.

"*Special Issue No. 2.* Do you find from a preponderance of the evidence that such damage or injury, if any, occurred after September 23, 1966? Answer 'yes' or 'no'. Answer: No.

"*Special Issue No. 3.* Find from a preponderance of the evidence the cost, in Zavala County, Texas, of the reasonable and necessary repairs, if any, to such main dwelling house on November 1, 1968, to restore same to the condition it was in on November 1, 1963, less natural wear and depreciation to same during such period. Answer in dollars and cents, if any. Answer: $1,143.00."

and, therefore, no jury issues were submitted or requested regarding same. Nevertheless, each of the three parties urges that said instruments clearly and unambiguously support his construction of same. The trial court concluded that Neuman and Manges were jointly and severally liable on the lease obligations and entered judgment for the sum of $17,956 as found by the jury, less a credit of $4,105.78 for the sum deposited in escrow by Neuman and Manges. Both Neuman and Manges have perfected an appeal from this judgment.

## NEUMAN APPEAL

■ The original lease agreement required Neuman to return the property to appellees in as good a condition as when received, natural wear and depreciation alone excepted, and to prevent the spread of Johnson grass. Neuman urges, however, that appellees are estopped from claiming any breach of contract, and further, that appellees waived any such claim for damages for breach of contract. It must be recognized at the outset that since no issues of estoppel or waiver were requested by Neuman, he must establish all the essential elements of same [4] as a matter of law.

■ Neuman asserts several things which he says operate as waivers and estoppels to bar any recovery of damages by appellees. Neuman points out that appellees continued to accept the agreed annual rental without complaining of any damage or without urging the contractual right to cancel the lease for default of the lease provisions. This contention is without merit. The obligation was to deliver the property at the termination of the lease in good condition. Willoughby testified that the only damage he noticed during the lease period was that some of the partition fences had been taken down, and upon inquiry, Neuman promised to replace same at the end of the lease. At the very least, a fact issue would be raised concerning appellees' knowledge of a breach of the covenant to keep the property in good repair.

■ Nor can it be said that appellees waived their contractual right to have the property returned in good condition by requiring an escrow deposit of $5,000 to be made. Rather, it would seem that such deposit demonstrates that appellees expected to be paid for any damage. Nothing in the language of this provision of the sublease can be construed as an agreement by appellees to limit their recovery to such amount. Furthermore, it is seen that appellees, while consenting to the sublease and assignment to Manges, expressly refused to release Neuman from his obligation under the original lease. It cannot be said that, as a matter of law, appellees are estopped from seeking to enforce such obligations against Neuman or that a claim for breach of such obligations was waived. Neuman's first and second points are without merit and are overruled.

Neuman asserts by his third point that he is entitled under the clear and unambiguous language of the sublease to be indemnified by Manges for all liability to appellees under the original lease agreement. The sublease provides in part as follows:

"Sub-Lessee further agrees and covenants that he will carry out all of the terms, conditions and requirements set forth in the original Willoughby et ux lease contract above referred to, and agrees and covenants that he will not in any way violate any of such terms, conditions and requirements, and further agrees and covenants to hold the Sub-Lessor harmless from any and all liabili- whatsoever which might arise or be occasioned by the violations of said Willoughby et ux lease, FROM THE DATE OF THIS SUBLEASE FORWARD TO THE FINAL TERMINATION THEREOF." (Emphasis ours).

Neuman has not made any complaint of the jury's refusal to find that any of the

---

4. See Ford v. Culbertson, 158 Tex. 124, 308 S.W.2d 855, 865 (1958).

elements of damage occurred after the date of the sublease. He urges, however, that the clear intent of the parties was that Manges would assume all obligations of the lease. In support of this intent, Neuman offered an instrument executed to supplement a contract of August 23, 1966, whereby Neuman agreed to sell his farm adjoining the Willoughby property to Manges. In the supplemental agreement of August 24, 1966, Manges agreed to take over all obligations of Neuman with regard to the Willoughby lease either as assignee or sublessee, if possible; or to custom-farm said property for Neuman, but on behalf of Manges. While we do not consider the agreement of August 24 to be in conflict with the final agreement executed on September 23, 1966, by Neuman, Manges and appellees, it is obvious that any conflicts would be resolved in favor of the last instrument.

■ Thus, the question is whether Manges' agreement to assume all obligations of the original lease can be construed as an agreement to indemnify Neuman for his responsibility for any damages which occurred prior to the sublease.[5] Texas follows the general rule that an indemnity agreement will not protect the indemnitee against the consequences of his own negligence unless the obligation is expressed in unequivocal terms. Joe Adams & Son v. McCann Construction Company, 475 S.W. 2d 721 (Tex.1972); M. J. Delaney Company v. Murchison, 393 S.W.2d 705 (Tex. Civ.App.—Tyler 1965, no writ); Freight Terminals, Inc. v. Ryder System, Inc., 461 F.2d 1046, 1054 (5th Cir. 1972, approving 326 F.Supp. 881, [U.S.Dist.Ct., S.D.Tex. 1971]).

■ Here, although Manges agreed to assume all the obligations of lessee in the original lease contract, he expressly agreed to hold Neuman harmless only for violations of the lease occurring after the date

of the sublease. Since the jury did not find that any of the damage occurred after this date, the trial court did not err in rendering judgment against Neuman on his obligation under the original lease agreement.

Neuman urges by his final point that the trial court erred in not granting a new trial because of the misconduct of a juror in taking notes during the trial as to the cost of repair of the various items of damage. During the course of the jury deliberations, this juror advised at least some of the other jurors of these amounts. The notes were not introduced at the hearing of the motion for new trial, but Neuman does not contend that any of the amounts stated by the juror were erroneous or that any information given by the juror was outside the record. The trial court found that there was no evidence that the notes were held out as evidence in the case and overruled the motion for new trial.

■ There is no prohibition in the Texas Rules of Civil Procedure against the taking of notes by a juror, nor is there any instruction regarding same in the approved instructions to the jury promulgated in Rule 226a thereof. We have not found any Texas authority wherein such practice has been held erroneous or even condemned. Cf. Commercial Music Company v. Klag, 288 S.W.2d 168 (Tex.Civ.App.— San Antonio 1956, no writ). To the contrary, such practice might be desirable in a jury trial of accounting suits or other complicated suits. See 89 C.J.S. Trial § 456. We suggest, however, that where a juror is observed taking notes, the court should instruct the jury that such notes are not evidence, and that if the jury should disagree as to the testimony of any witness, the foreman may apply to the court and have the court reporter's notes read to the jury. See Rule 287, supra. This would minimize the possibility of a juror improperly giving evidence in the jury room.

5. Some argument is made as to whether this was a sublease or assignment. It is seen that the parties referred to the instrument as both. Our decision is controlled by the language of same, not its title.

Here the trial court found that such notes were not held out as evidence; and, therefore, no error was shown in the juror's use of notes taken during the trial. In any event, such action would be harmless, since there is no showing that the notes did not correctly reflect the testimony of the trial. Therefore, it cannot be said that injury probably resulted to the complaining party so as to require a new trial. Rule 327, supra; Fountain v. Ferguson, 441 S.W.2d 506 (Tex.1969); Willis v. Goodrum, 360 S.W.2d 182 (Tex.Civ.App. —San Antonio 1962, writ ref'd n. r. e.); Brooks v. Temple Lumber Co., 105 S.W.2d 386 (Tex.Civ.App.—Beaumont 1937, no writ); Pope, Jury Misconduct and Harm, 12 Baylor L.Rev., 355–357 (1960).

## MANGES APPEAL

Manges urges by his first point that he is not liable for any damages which occurred prior to the assignment and sublease of September 23, 1966. He contends that by the clear and unambiguous terms, the intention is expressed that he be liable only for damages occurring subsequent thereto. Such contention overlooks the provision whereby Manges expressly assumed *all obligations* of the Willoughby lease. See: Amco Trust, Inc. v. Naylor, 159 Tex. 146, 317 S.W.2d 47, 50 (1958); Jones v. El Paso Natural Gas Products Co., 391 S.W.2d 748, 754 (Tex.Civ.App.— Austin 1965, writ ref'd n. r. e.). This was an obligation to appellees and would be some consideration for their consent to the sublease. Furthermore, it would have been unnecessary for Manges to agree to hold Neuman harmless for damage occurring after September 23, 1966, if the agreement had clearly expressed a prior intention that Manges would take over the obligations of the lessee as of that date, but from that date only. In any event, there is no finding that all the damages occurred prior to September 23, 1966. The jury's failure to find, from a preponderance of the evidence, that the damages occurred subsequent to that date cannot be considered as

an affirmative finding that they occurred prior thereto. C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194 (Tex.1966). Manges did not establish as a matter of law that he is not liable for the damages to the leased property. His first point is overruled.

Manges' remaining four points relate to the damage issues. He urges that the trial court erred in admitting testimony of Willoughby as to the amount of monetary damages sustained thereby, and in admitting certain photographs. He asserts that the evidence is legally insufficient to justify submission of the damage issues and factually insufficient to support the jury findings thereon. Appellees' evidence relating to the reasonable cost of repairs of the various items of damage was meager; however, such evidence was uncontradicted and was admitted largely without objection.

## CONTOUR BORDERS

Mr. Williamson, an employee of the Soil Conservation Service in Zavala County, designed a parallel border irrigation system in about 1947, whereby approximately 116 acres of the Willoughby farm was irrigated by contour borders. Extensive land preparation is required to put in such a system. The land must be shredded and cleaned; it is then disked and chiseled so that it can be leveled before the contour lines are laid; a maintainer is then used to shape the contour borders. After construction, the contour borders deteriorate if not maintained. There is sufficient evidence from Willoughby and Calletano Rios, an employee of Willoughby, that these contour borders were in good condition at the beginning of the lease and had disappeared by the termination of such lease. The problem arises over proof of the extent of damage sustained by appellees.

The jury found that the reasonable and necessary cost of repairs to restore such contour borders to the condition they

should have been in at the termination of the lease was $3,994. This is based on testimony as to the cost of putting in such a system. Willoughby first endeavored to testify that it cost "around $20" per acre to prepare the land. However, the trial court sustained Manges' objection to the vagueness of the answer. Willoughby subsequently testified that he was unable to give a specific answer, and his attorney made no further inquiry of the reasonable cost of preparing the land. Nor did he attempt to prove same by any other witness. Thus, there is no proof of the reasonable cost of land preparation, even if we assume that it would be necessary to prepare the land in order to repair these border contours.

Willoughby did subsequently testify without objection that the actual construction of the borders would require from three-and-one-half to five hours' work per acre with a maintainer, and that the cost of such maintainer would be $7 per hour. Williamson testified such work would take from two to three hours per acre. Appellees suggest in their brief that a total of 406 hours were shown to be necessary to construct the contour border from Willoughby's testimony, and at $7 per hour, the cost of constructing the borders is $2,843. Such sum obviously does not support the jury finding of $3,994, and ignores the testimony of appellees witness, Williamson. In any event, the evidence is factually insufficient to support this finding.

## REMOVAL OF INSIDE FENCES

■ At the time the farm was leased, it had a perimeter fence and was divided into 25 to 30 fields that were fenced to permit rotation grazing of cattle. This required 9.2 miles of cross-fences which were constructed with net at the bottom and 2–3 strands of barbed wire at the top. Willoughby and Rios testified that the inside fences were in good condition when the lease was executed and were destroyed when the property was returned. This was not denied by appellants, who apparently did not use the property in the same manner as appellees. Willoughby testified without objection that he knew the cost of constructing a fence in 1968, and that it cost about $875 per mile, using his own labor. This uncontradicted testimony supports the jury finding of $8,050.

## INFESTATION OF JOHNSON GRASS

■ The original lease agreement required the lessee to prevent Johnson grass from spreading on the leased premises. Several witnesses testified on behalf of appellees relative to the infestation of the leased premises with Johnson grass during the term of the lease. It is probably a fair conclusion from the testimony of these witnesses that it is not possible to completely eradicate Johnson grass from a farm in this area, and that constant vigilance and work are necessary to control same. Nevertheless, the testimony of Willoughby, Rios, M. L. Coleman and R. B. Willoughby, Jr., supports a conclusion that Johnson grass was under control and that the leased premises were relatively clean at the time of the original lease. Willoughby testified that Johnson grass was kept out by grubbing and burning of the roots of Johnson grass as it appeared. There is evidence, which is not now challenged, that during the lease term the premises were permitted to become infested with Johnson grass.

In addition to testimony describing such infestation, photographs were made in the summer of 1969 which were offered for the limited purpose of showing the extent of the infestation, as the Johnson grass was then in full growth. Although Manges now complains of the introduction of such pictures because they were taken several months after the termination of the lease, his attorney stated at the trial that he had no objection to their introduction for the limited purpose stated above. The trial court admitted same for this purpose, and no error is shown by such action.

The theory of appellees' recovery for this infestation was the cost of eradicating

or removing such infestation. No objection was made at the trial to this theory of recovery, and the jury finding of $4,394 is fairly supported by the testimony of Coleman, who was employed to spray the fields, and Willoughby, Jr., as to the reasonable cost of spraying the infected fields on several occasions.

## REPAIRS TO MAIN DWELLING HOUSE

 There is sufficient evidence from Willoughby and Rios that the main dwelling house was in good condition at the inception of the lease and was damaged in several particulars when returned to appellees. Willoughby attempted to testify to the reasonable and necessary cost of repairs. However, the trial court sustained Manges' objections to Willoughby's lack of qualifications each time Willoughby was asked to express an opinion as to the reasonableness of the amount spent on repairs. Appellees' counsel then "temporarily" turned from the consideration of repairs to the main dwelling house to other items of damage. Unfortunately, he did not make any further effort to prove the necessary and reasonable cost of repairs to the main dwelling house. Therefore, the trial court erred in submitting such issue to the jury and in entering judgment for the sum of $1,143 found by the jury.

## CULVERTS

Appellants have not briefed any complaint regarding the jury finding that the sum of $375 was the reasonable and necessary cost of repairs of the culverts damaged during the term of the lease.

## OUR JUDGMENT

We have considered and overruled all of appellants' points of error, except those relating to the reasonable cost of repairs to the main dwelling house and the border contours. Proper proof is totally lacking as to the reasonableness of the cost of necessary repairs to the main dwelling house, and the trial court erred in including the sum of $1,143 in the judgment. The border contours present a more difficult problem. The testimony of the disinterested witness, Williamson, supports a recovery for a minimum of 232 hours' use of a maintainer necessary to rebuild the border contours. The uncontradicted testimony is that the reasonable cost of such use is $7 per hour, which supports a minimum recovery of $1,624, rather than the sum of $3,994 as granted in the judgment.

The judgment of the trial court is reformed by deleting the sum of $3,513 from the judgment granted appellees, and in all other respects the judgment is affirmed. The costs of this appeal are taxed one third against appellant Neuman, one third against appellant Manges, and one third against appellees.