**Tom H. DAVIS, et ux., Appellants,**

v.

**Robert M. HUEY, et ux. et
al., Appellees.**

**No. 13183.**

Court of Civil Appeals of Texas,
Austin.

Nov. 5, 1980.

Rehearing Denied Nov. 26, 1980.

Tom H. Davis, Byrd, Davis & Eisenberg, Austin, for appellants.

Douglas D. Hearne, Douglass D. Hearne & Associates, and Eskew, Muir & Bednar, Austin, for appellees.

SHANNON, Justice.

Appellants, Tom H. Davis and Hattie Davis, husband and wife, appeal from a permanent injunction entered by the district court of Travis County ordering them to remove a portion of their partially–constructed house and enjoining any further construction until plans for such construction have been approved in writing by appellee Austin Corporation. Other appellees are Robert M. Huey and Mary Paige Huey, husband and wife, and David B. Barrow. The principal issue on appeal concerns the meaning of a restrictive covenant that is applicable to appellants' lot. This Court

will affirm the judgment of the district court.

This appeal is another phase of a continuing dispute between the parties. In April of 1977, the Hueys filed suit against appellants in the district court of Travis County seeking an injunctive order prohibiting appellants from proceeding with construction of the house, and ordering removal of such structure in violation of the restrictive covenant. After hearing, the district court denied appellees' application for temporary injunction. This Court reversed that judgment and granted the relief sought by appellees. *Huey v. Davis*, 556 S.W.2d 860 (Tex.Civ.App.1977), *rev'd on other grounds*, 571 S.W.2d 859 (Tex.1978). The Supreme Court reversed the judgment of this Court and remanded the cause to the district court for trial on the merits. *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978).

The holding of the Supreme Court was that this Court's review of the order refusing the temporary injunction should have been limited to whether there had been an abuse of discretion by the district court. The Supreme Court concluded, "Without intruding upon the merits of the underlying cause of action, it may be concluded that at least some basis exists upon which the trial court could have properly held that the Hueys were not entitled to a temporary injunction pending the final hearing." *Davis v. Huey, supra* at page 863.

Appellees' cause of action is predicated upon paragraph eight of a set of restrictive covenants applicable to all lots in Northwest Hills, Section Seven Addition, including those owned by appellants and the Hueys. Appellants' lot adjoins the Huey lot on the canyon rim of an area known as Cat Mountain. The restrictive covenants provide as follows:

"1. *Designation of Use*
All lots shall be used for single family residential purposes, with not more than one residence on any lot. No lot shall be used for a trade or profession; nor shall anything be done on any lot which may be or may become an annoyance or nuisance to the neighborhood. The Developers, however, may erect a temporary sales office on any lot selected by them, in accordance with the zoning regulations of the City of Austin.

2. *Retention of Easements*
Easements are reserved as indicated on the recorded plat.

3. *Temporary Structure and Garage Apartments*
No apartment house, house trailer, tent, shack, garage apartment or other out-building shall be placed, erected, or permitted to remain on any lot or plot, nor shall any structure of temporary character be used at any time as a residence thereon.

4. *Separate Garages, Guest Houses, Etc.*
A separate garage building, servants' quarters of one story, or a one story quest house not to exceed 600 square feet of floor area will be permitted, provided that such structure or structures must be attached to the main residence by a common wall or by a covered passage–way, provided that the main dwelling be substantially completed prior to said erection and provided further that all other restrictions, covenants, conditions and uses herein are complied with.

5. *Minimum Plat Size*
No structure shall be erected or placed on any plot which plot has an average width of less than 70 feet. No resubdivision of existing lots shall be made which would create an additional lot or plot; but this shall nor prevent the modifying of boundaries of original lots in conformity with the above minimum width. For the purpose of these restrictions, a 'plot' shall consist of a lot or lots having a contiguous frontage and having an average width of not less than 70 feet.

6. *Size and Construction of Dwellings*
All dwellings shall be of recognized standard construction. The dwelling erected on any plot shall cover not less than 1,500 square feet of floor area of which not less than 1,300 square feet shall be in the house proper, exclusive of garage and porches. Ornamental structures, fences

and walls are permitted subject to approval in writing by the Developers, or in the alternative by the Architectural Committee referred to under Paragraph No. 8.

7. *Set–Back, Front Line, Side Line and Rear Line*

No structure shall be located or erected on any lot nearer to the front plot line than twenty–five (25) feet, nor nearer than five (5) feet to any side plot line except that the total combined setback from both sides shall in no event be less than fifteen (15) feet, nor nearer than fifteen (15) feet to the rear plot line.

8. *Architectural Control and Building Plans*

For the purpose of insuring the development of the subdivision as a residential area of high standards, the Developers, or in the alternative an Architectural committee appointed at intervals of not more than five years by the ten owners of a majority of the lots in Northwest Hills Section Seven Addition, reserve the right to regulate and control the buildings or structures or other improvements placed on each lot. No building, wall or other structure shall be placed upon such lot until the plan therefor and the plot plan have been approved in writing by the Developers. Refusal of approval of plans and specifications by the Developers, or by the said Architectural Committee, may be based on any ground, including purely aesthetic grounds, which in the sole and uncontrolled discretion of the Developers or Architectural Committee shall seem sufficient. No alterations in the exterior appearance of any building or structure shall be made without like approval. No house or other structure shall remain unfinished for more than two years after the same has been commenced.

9. *General Covenants*

These provisions are hereby declared to be conditions, restrictions, uses and covenants running with the land and shall be fully binding on all persons acquiring property in Northwest Hills Section Seven Addition, whether by descent, devise, purchase or otherwise, and every person by the acceptance of title to any lot of this subdivision shall thereby agree to abide by and fully perform the foregoing conditions, restrictions, uses and covenants, which shall be binding until January 1, 1986. On and after January 1, 1986, said conditions, restrictions, uses and covenants shall be automatically extended for successive periods of ten years unless changed in whole or in part by a vote of three–fourth majority of the then owners of the lots in Northwest Hills Section Seven Addition, each lot, or plot, to admit of one vote.

10. *Penalty Provisions*

If any person or persons shall violate or attempt to violate any of the above conditions, restrictions, uses and covenants, it shall be lawful for any other person or persons owning any of the lots in Northwest Hills Section Seven Addition to prosecute proceedings at law or in equity against the person or persons violating or attempting such violations to prevent him or them from so doing, or to recover damages for such violations. No act or omission on the part of any of the beneficiaries of the covenants, conditions, restrictions and uses herein contained shall ever operate as a waiver of the operations of or the enforcement of any such covenant, condition, restriction or use."

Appellants presented their plans to appellee developers pursuant to the requirements of the above covenant. The developers disapproved the plans. Appellees pleaded that the disapproval of appellants' plans was a reasonable, good faith exercise of the discretion vested in them by the restrictive covenant. More specifically, appellees claimed that completion of appellants' house would reduce the value of the Huey property as well as neighboring property because of its extreme size, placement and disharmony with other houses already built. In addition, appellants' planned construction would obstruct the visual enjoyment of the scenery provided by the natural valley below and the southerly and southwesterly panorama of Northwest Hills, shared by the Hueys and other neighbors.

Despite the developer's disapproval, appellants launched construction of their house in the spring of 1977. Appellees filed suit in April, 1977.

The district court submitted the case to the jury by two special issues. Upon timely request, the district court also filed findings of fact and conclusions of law. The jury answered special issue number one that the developers, in refusing to approve appellants' plans, acted reasonably and in pursuance of a general plan or scheme to insure the development of the subdivision as a residential area of high standards. In connection with the submission of special issue number one, the court instructed the jury:

> "Under the provisions of Paragraph 8 of the restrictive covenants, the developer had the right to refuse to approve plans or plot plan provided that he acted reasonably and provided that his refusal was in pursuance of a general plan or scheme to insure the development of the subdivision as a residential area of high standards.
>
> You are further instructed that the term 'general plan or scheme' means that the restrictions employed by the developer are substantially uniform and are imposed upon substantially all of the lots in the restricted area and that such plan or scheme was intended, understood, and relied upon by the developer and substantially all of the purchasers of lots in the subdivision, and has been maintained from the beginning without material departure therefrom."

In answer to special issue two the jury refused to find that the only reason considered by the developers in refusing to approve appellants' plan was the effect of appellants' house upon the view from the Huey house.

Acting pursuant to its equity powers, the district court filed extensive findings of fact and conclusions of law. In its findings of fact the court found *inter alia* that prior to selling any of the lots in the subdivision, the developer established a plan or scheme for development of the subdivision as a residential area of high standards, that plan being impressed upon all lots in the subdivision by restrictive covenants prior to selling any of those lots. This plan or scheme as developed prohibited placing any building, wall or structure upon any lot until the plan therefor and the plot plan were approved in writing by the developer. The court further found that the developer, in refusing to approve appellants' plans and plot plans, took into consideration at least the following factors:

(1) the extreme placement of the appellants' proposed house upon the lot;

(2) the proximity of the house to the home of the Hueys;

(3) the extreme height, size and bulk of the house in relation to the building plot and in the context of the established residential area of high standards in which it was proposed to be placed;

(4) the adverse effect of the location of the house upon the houses of the neighbors;

(5) the overall scheme of the location of the other houses already built in the subdivision and their placement upon their respective lots;

(6) the development of the subdivision as a residential area of high standards.

The district court found that appellants deliberately and intentionally proceeded with the construction of their building after the developer had refused to approve their plans and plot plans knowing that their right to do so was being challenged in court. In refusing to approve appellants' plans and plot plans, the developer informed appellants that if they would move their proposed structure eighteen feet to the north and four feet to the west, the developer would reluctantly approve their plans and plot plan. The court found that if appellants had made these suggested modifications, their savings would have been more than the cost of compliance with the district court order, and any additional costs would have been inconsequential in relation to the total costs of the structure. Substantially all of the cost which will be incurred by

appellants in complying with the judgment are the result of appellants deliberately and intentionally beginning construction after their right to do so was challenged in this suit, and by continuing construction while the suit was being diligently prosecuted by appellees.

The court found further that the developer has enforced the restrictive covenants pertaining to Northwest Hills, Section Seven Addition, in a substantially uniform manner. Continued enforcement of the restrictive covenants in a substantially uniform manner will be of material benefit to the developer and all persons owning lots in Northwest Hills, Section Seven Addition, and other subdivisions established by the developer. In exercising the discretion vested in it under the restrictive covenants, the developer has consistently refused to approve plans and plot plans for construction which would substantially interfere with scenic views and visual enjoyment of the natural scenery from adjoining or nearby lots. Enjoyment of the view and scenery provided by the natural valley south and southwest of the lots owned by the Hueys and appellants has been one of the inducements to purchase lots along this natural canyon rim. In refusing to approve appellants' plans and plot plans, the developer sought to preserve the substantially uniform plan or pattern placement of houses along the canyon rim for the common benefit of all lots owners living along that rim.

In its conclusions of law the district court determined that the restrictive covenants pertaining to Northwest Hills, Section Seven Addition, vest in the developer the discretion to decide whether a proposed structure will contribute to the development of the subdivision as a residential area of high standards. In exercising this discretion, the developer is entitled to refuse to approve plans and plot plans provided he acts in good faith and has reasonable grounds to insure the development of the subdivision as a residential area of high standards. In exercising this discretion, the developer is entitled to judge the proposed plans and plot plans on grounds not enumerated in paragraphs one through seven of the restrictive covenants provided such additional grounds reasonably related to the development of the subdivision as a residential area of high standards. Preservation of scenic views and visual enjoyment of the scenery provided by the natural valley south and southwest of the lots owned by the parties are valid considerations for the developer in seeking in insure the development of the subdivision as a residential area of high standards. The height, shape, size and the location of a proposed structure in relation to the natural topography and neighboring structures are valid considerations for the developer in seeking to insure the development of the subdivision as a residential area of high standards. Finally, the district court concluded that in the exercise of its equitable powers, the court was empowered to order appellants to remove all or part of the structure that appellants built without the developer's approval.

The judgment permanently enjoined appellants and their agents from proceeding with any further construction on their lot until plans for such construction have been approved by the developer pursuant to the restrictive covenant. Further, the judgment ordered appellant to remove a part of the house already constructed.

One day after entry of judgment, appellants filed a supersedeas bond. According to the parties, work on appellants' house was still in progress at time of submission.

Appellants attack the judgment by twenty–six points of error; many of such points contain several "sub–points." Appellants assert their principal contention in point of error one, claiming that the district court failed to properly construe the restrictive covenants and failed to establish legal limits upon the developer's approval authority.

■ The writer of this opinion adheres to the holding of this Court in its prior opinion in the first appeal: specifically, that a covenant requiring written approval of the building plans by the developer prior of any placement of any structure on a lot in a subdivision is valid and enforceable when

exercised reasonably and pursuant to a general plan or scheme. *Huey v. Davis, supra.* In addition, the holding in the prior opinion should be regarded as "law of the case." See generally, Hatchell, *The Doctrine of "Law of the Case"* in State Bar of Texas, *Appellate Procedure in Texas* § 21 (1979). Other cases announcing the validity of covenants of the character here involved, but not cited in *Huey v. Davis, supra,* are *Aluminum Co. of America v. Kohutek,* 455 S.W.2d 789, 797 (Tex.Civ.App.1970, no writ); *Vaughn v. Fuller,* 175 So.2d 103 (Ala. 1965); *Kirkley v. Seipelt,* 212 Md. 127, 128 A.2d 430 (Md.1957); *Parsons v. Duryea,* 261 Mass. 314, 158 N.E. 761 (Mass.1927). ·

Under point of error one, appellants insist that paragraph eight of the restrictive covenant does not empower the developer to establish height, size, or placement limitations more restrictive than those specifically enumerated in paragraphs one through seven of the restrictive covenant. In support of their argument, appellants refer to the general rules that restrictive covenants are to be strictly construed, favoring the grantee over the grantor and resolving all doubts in favor of the free and unfettered used of the property.

Appellees respond that paragraph eight indicates that the developer's refusal to approve may be based upon any reasonable ground pursuant to a general plan or scheme and is not limited to those specific standards described in paragraphs one through seven.

The first opinion by this Court properly construed and applied the restrictive covenants in question and is the "law of the case." As in other written instruments, the end sought in the construction of restrictive covenants is to ascertain the intent of the parties as revealed by the language used in the covenant. *Couch v. Southern Methodist University,* 10 S.W.2d 973 (Tex.Comm'n App.1928, jdgmt. adopted); *Curb v. Benson,* 564 S.W.2d 432 (Tex. Civ.App.1978, writ ref'd n. r. e.). Words and phrases used in a restrictive covenant will be accorded their ordinary and commonly accepted meaning. *Settegast v. Fo-ley Bros. Dry Goods Co.,* 114 Tex. 452, 270 S.W. 1014 (Tex.Comm'n App.1925, opinion adopted); *Curb v. Benson, supra.* The rule that restrictive covenants are strictly construed, favoring the grantee over the grantor and resolving all doubts in favor of the free and unrestricted use of the premises is applicable only when the intent of the parties is not ascertainable from the terms of the covenant, *Curb v. Benson, supra; Atkins v. Fine,* 508 S.W.2d 131 (Tex.Civ.App. 1974, no writ). In the opinion of this Court, the language of paragraph eight is readily ascertainable from the face of the covenants, and, the position of appellees is correct.

The construction urged by appellants would reduce the developer's review of the plot plan to a mechanical tally to determine whether or not the plan meets the requirements of paragraphs one through seven checklist. If such were the case, there would be no need for an architectural control committee. Appellants' construction would require the court to ignore entirely the language of paragraph eight that vests the developer with the power to "regulate and control the buildings or structures or other improvements placed in each lot." This Court would have to turn a blind eye to the additional language in paragraph eight that entitles the developer to disapprove the plot plan "on any ground, including purely aesthetic grounds."

When the critical words in paragraph eight are given their ordinary and common meaning, it is plain that the developer intended to have the power to consider all features of the proposed structure, and not simply to monitor the plot plan to insure that it complied with paragraphs one through seven. By the inclusion of paragraph eight in the covenant, the developer plainly intended to have the authority to disapprove a plot plan providing for a structure that complied with the minimum requirements of paragraphs one through seven, but would significantly diminish the value of other property in the subdivision. Because the developer's authority clearly appears from the terms of the covenant, ap-

pellants' restrictive rules of construction are not applicable.

Points of error two, three, and four assert in varying fashion that there is no evidence to support the jury finding that the developer in refusing to approve appellants' plans acted pursuant to a general plan or scheme. The court correctly defined the term "general plan or scheme" for the jury. No complaint is made as to the correctness of that definition.

■ The developer's right to approve plot plans, as set out in paragraph eight, is limited by the rule that the exercise of such right must be both reasonable and pursuant to some general scheme or plan of development. *Davis v. Huey, supra.* Appellees, as parties seeking to enforce the restrictive covenant, had the burden to prove the existence of a general building plan or scheme. *First State Bank of Corpus Christi v. Janes,* 471 S.W.2d 868 (Tex.Civ.App.1971, no writ). One way to establish a general building plan or scheme is by proof of reciprocal covenants whereby the grantor covenants to insert like covenants in all deeds out of the common development. *Lehmann v. Wallace,* 510 S.W.2d 675 (Tex.Civ.App. 1974, writ ref'd n. r. e.). Appellees also had the burden to show that the general plan or scheme had been implemented. *See Gibbs v. Garden Oaks Board of Trustees,* 459 S.W.2d 478 (Tex.Civ.App.1970), *on remand,* 489 S.W.2d 133 (Tex.Civ.App.1972, writ ref'd n. r. e.).

■ The evidence was that the developer, when it owned all of the land in the subdivision, impressed upon all of the lots in the subdivision a uniform set of restrictive covenants for the benefit of all lot owners, in order to insure the development of a "residential area of high standards." The restrictive covenants were filed of record in the deed records of Travis County before any lots were sold. There was evidence that some owners in the subdivision, including the Hueys, had been aware of the restrictive covenants prior to the purchase of a lot and that the existence of the covenants was a factor in the decision to purchase lots within the subdivision. The fact that appellants sought initial approval of their plans in compliance with paragraph eight is some indication that appellants recognized and acquiesced in the requirements of paragraph eight.

Testimony from David Barrow, Jr., and another architect, John Fitzpatrick, established that the developer implemented the general plan or scheme in a substantially uniform and reasonable manner. Points of error two, three, and four are overruled.

Point of error five is, in effect, that there is no evidence that the developer acted reasonably in disapproving the plot plan. As noted previously, the developer's right to approve plot plans, as set out in paragraph eight, is limited by the rule that the developer's exercise of the right must be reasonable. The jury, by its answer to special issue one, found that the developer had acted reasonably in disapproving appellants' plot plan.

Appellants' fifth point of error states: "[T]he trial court failed to require appellees to meet their burden of proof in establishing that the developer's actions in disapproving appellants' plans were reasonable when the written covenants and the limits of the developer's authority are properly construed and all necessary facts are taken into consideration."

■ It is doubtful that point of error five complies with Tex.R.Civ.P. 418 in that it does not direct the attention of this Court to any specific error complained of. Under such a general point, appellants could, and do, urge a great number of contentions. One such contention is that the matter of reasonableness by the developer in disapproving the plot plan was for consideration by the court and not the jury. The question is not one concerning the reasonableness *vel non* of the provisions of the covenant itself, but instead the reasonableness *vel non* of the developer's exercise of the right to approve or disapprove. Whether the developer acted reasonably under the circumstances in withholding consent is plainly a question of fact and was correctly submitted to the jury. Under the penum-

bra of point five, appellants also charge error by the district court in refusing to give thirteen requested instructions. Several of the instructions embodied familiar rules of construction employed by courts in the construction of written instruments. The district court properly refused to submit such instructions. The other requested instructions had no bearing on the issue of reasonableness of the developer's withholding consent, and were also properly refused.

■ After the developer had initially refused to approve appellants' plot plan, appellants submitted the same plans to the developer on two subsequent occasions. The developer refused to approve these plans unless appellants relocated their house on their lot. Appellants offered evidence showing their second and third requests for approval and the developer's rejection of those requests. The denial of the district court of appellants' offer is the basis for appellants' eleventh point of error.

Requests for and refusals of approval, subsequent to the filing of suit, have no bearing or relevancy on the validity of the initial refusal by the developer, when the initial refusal is the basis for suit. The point is overruled.

■ Appellants' point of error twelve is that the district court erred in allowing a reshuffling of the jury panel list at appellees' request, after appellees had an opportunity to study the jury list. Texas R.Civ.P. 223 provides as follows:

"In counties governed as to juries by the laws providing for interchangeable juries, the names of the jurors shall be placed upon the general panel in the order in which they are drawn from the wheel, and jurors shall be assigned for service from the top thereof, in the order in which they shall be needed, and jurors returned to the general panel after service in any of such courts shall be enrolled at the bottom of the list in the order of their respective return; provided, however, that the trial judge upon the demand of any party to any case reached for trial by jury, or of the attorney for any such party, shall cause the names of all the members of the general panel available for service as jurors in such case to be placed in a receptacle and well shaken, and said trial judge shall draw therefrom the names of sufficient number of jurors from which a jury may be selected to try such cause, and such names shall be transcribed in the order drawn on the jury list from which the jury is to be selected to try such case."

Travis County has interchangeable juries, and Rule 223 is applicable. The reshuffle provisions of Rule 223 are designed to insure a random selection of jurors. *Rivas v. Liberty Mutual Insurance Company*, 480 S.W.2d 610 (Tex.1972).

The evidence indicates that in Travis County the names of jurors are selected by computer from the jury wheel and the clerk's office "scrambles" those names prior to assignment to a particular list. Appellants claim this "scrambling" of the juror's names is a shuffling of the jury panel list prior to presentation of the list to the district court. That shuffle, the argument continues, satisfies the requirement of Rule 223, and the district court, by acceding to appellants' demand, caused the names to be shuffled twice. Appellants' point of error is not meritorious and will be overruled.

It may be that the practice in Travis County results in the jurors' names on the list being shuffled prior to the time the list is sent to the trial court from the general jury panel. Rule 223, however, contemplates that a party to any case or his counsel may have the jury list shuffled *after* the list is sent to the particular court. A party's right to reshuffle pursuant to Rule 223 obtains irrespective of the fact the clerk's office has scrambled or shuffled the jurors' names prior to assignment of the list to a particular court. Contrary to appellants' argument, the fact that the party or counsel may have examined the jury list prior to making demand pursuant to Rule 223 has no bearing, in our view, upon that party's right to a reshuffle.

The district court should not be held in error for granting a party's demand to re-

shuffle the jury, a right expressly authorized by Rule 223. *Patterson v. East Tex. Motor Freight Lines*, 349 S.W.2d 634 (Tex. Civ.App.1961, writ ref'd n. r. e.).

Point of error thirteen is that the court erred in denying appellants' motion for mistrial made after appellees' counsel requested in the presence of the jury that appellants agree to a jury view.

Photographs depicting different views of the lots in question and phases of appellants' construction were introduced by the parties. Appellants contended that some of appellees' photographs gave an improper perspective of the area. In fact, appellants called a professional photographer, Walter Barnes, to testify to that effect.

The exchange that forms the basis for this point of error occurred during the time appellants' lead counsel, L. Tonnett Byrd, had called himself as a witness to identify two photographs of a deer head for the purpose of demonstrating that misleading impressions may be gained from photographs of the same subject matter, depending upon the distance of the camera from the object.

On cross examination, appellees' counsel asked Mr. Byrd whether appellees' aerial photographs were distorted or failed to give a true picture. Mr. Byrd answered that the photographs were not distorted, but they gave an "erroneous perspective." The following exchange transpired:

"Q  Well, if there had been any question placed in these juror's minds, Mr. Byrd, about distortions or erroneous effects, are you willing, if I am willing, for this jury to go out there and take a view of the site?

A  The Judge has already told us what can be done there, and you know it. We don't have any choice about it. I would be willing, yes.

MR. HEARNE: Your Honor, with that stipulation, we are willing for the jury to make a view of the site.

MR. BYRD: Fine

MR. HEARNE: As I understand it under the rules, that if the parties all agree, the jury can make a view of the site and that is—we would like very much for that to take place.

MR. BYRD: That would be agreeable with supervision.

THE COURT: Let's proceed with whatever we have now.

MR. HEARNE: All right, sir. I have no further questions, Mr. Byrd.

MR. BYRD: I want to add one thing. I do claim and I have proved there is a distortion in the wide view, as pointed out by Mr. Barnes, and as far as perspective, it is a deliberate distortion by the Plaintiffs' Exhibit No. 7, yes, sir.

MR. HEARNE: Yes, sir. Well, of course, we can clear all that up when we get out there on the ground, can't we?

MR. BYRD: We sure can.

MR. HEARNE: All right."

At a later point during trial, the district court informed the jury that the court on its own volition had decided not to permit a jury view.

■ There is no right to a jury view in this state, and it is error for counsel to request a jury view in the jury's presence. *Woodrum Truck Lines v. Bailey*, 57 S.W.2d 92 (Tex.Comm'n App.1933, jdgmt. adopted); *Bradshaw v. White*, 294 S.W.2d 736 (Tex. Civ.App.1956, writ ref'd n. r. e.).

■ Appellees' counsel should not have "challenged" counsel for appellants to agree to a jury view. Upon proper objection, the district court should have instructed the jury to disregard the improper suggestion and upon proper motion the district court could have, in its discretion, declared a mistrial. Instead of objecting or moving for a mistrial, however, counsel for appellants *agreed* to the view in the presence of the jury. As characterized by the district court in chambers during argument, counsel for appellants ". . . rather readily agreed to the jury view, and thereby before the jury, in effect, showed his muscle." The point of error will not be sustained in view of coun-

sel for appellants' agreement to the jury view and failure to object.

■ Point of error fourteen complains that the district court erred in denying appellants' motion for new trial based upon jury misconduct. Appellants claim that a juror, J. R. Rymal, took notes of the testimony of witness David Barrow, Jr., and read them during jury deliberation in an effort to influence other jurors.

Appellants, of course, had the burden to establish that jury misconduct occurred, and that such misconduct resulted in injury to them. *Watson v. Texas Indemnity Insurance Co.*, 147 Tex. 40, 210 S.W.2d 989 (1948); Tex.R.Civ.P. 327. After careful consideration, this Court has concluded that appellants failed to establish that jury misconduct occurred.

There was some disagreement among the jurors as to the content of some of the testimony by David Barrow, Jr. After some discussion, it was decided to ask the court to have certain parts of Barrow's testimony read to the jury. Prior to the decision to have the testimony read, there was testimony taken at the hearing for new trial that Rymal had referred to his notes three or four times in an effort to refresh his memory as to Barrow's testimony. After such review, he voiced his recollection of Barrow's testimony. Perhaps one or two jurors changed their vote prior to the time the testimony of Barrow was read. Furthermore, the evidence indicated that after Barrow's testimony was read back to the jurors, Rymal made no further reference to his notes, and made no more efforts to convince the other jurors based upon information contained in his notes. After Barrow's testimony was read to the jury, several jurors changed their votes in favor of appellees.

■ There is no prohibition in the Rules of Civil Procedure against the taking of notes by a juror, nor is there an instruction regarding the same in the approved instructions to the jury in Rule 226a. *Manges v. Willoughby*, 505 S.W.2d 379 (Tex.Civ.App. 1974, writ ref'd n. r. e.); *cf. Commercial Music Company v. Klag*, 288 S.W.2d 168 (Tex.Civ.App.1956, no writ). This Court has not been shown nor has it discovered any Texas authority specifically holding such practices erroneous. Nevertheless, there are Texas cases criticizing this practice. *English v. American & Foreign Ins. Co.*, 529 S.W.2d 810 (Tex.Civ.App.1975, no writ); *Guest v. American Petrofina Company*, 485 S.W.2d 926 (Tex.Civ.App.1972, no writ). According to one Texas decision, note-taking by jurors may even be helpful if the trial is long or complicated. *Manges v. Willoughby, supra.* The chief objection to such practice is the possibility that the notes might be regarded by jurors as evidence and not merely a device to refresh the recollection of the evidence.

■ In the case at bar, there was no proof that the notes were regarded as evidence; to the contrary, Rymal testified he used his notes to refresh his recollection of Barrow's testimony. In addition, the jury requested and obtained Barrow's testimony, thereby curing any possible misconception left by Rymal's recollection. The point is overruled.

By points nine and ten, appellants urge error by the district court in entering a mandatory injunction requiring the removal of a part of their house. Appellants maintain that the district court failed to "balance the equities" involved, since the disadvantages and injuries to be suffered by them will be much greater than those suffered by appellees if the permanent injunction is enforced.

Prior to commencement of construction, appellants knew that the restrictive covenant did not permit any construction without approval of the developer. Nevertheless, in face of the disapproval of their plans by the developer, appellants began construction in the spring of 1977. Appellees immediately filed suit, challenging appellants' right to proceed without approval. At all times thereafter, except for those periods during which they were under court order not to proceed, appellants have persisted with the construction of their house. This was done even though it was clear that

appellees had no intention of discontinuing the lawsuit.

■ Appellants state correctly that appellees made no effort to prove that the construction of appellants' house, as proposed, would reduce the value of the Huey property. It is established, however, that when there has been a substantial violation of a restrictive covenant, one need not show actual monetary damages to be entitled to injunctive relief. *Viking Homes, Inc. v. Larkin,* 452 S.W.2d 25 (Tex.Civ.App.1970, no writ); *Shepler v. Falk,* 398 S.W.2d 151 (Tex. Civ.App.1966, writ ref'd n. r. e.).

■ Removal of the offending structure is an appropriate remedy for violations of restrictive covenants, *Viking Homes, Inc. v. Larkin, supra,* as it is for encroachments across property lines. *Coleman v. Forister,* 497 S.W.2d 530 (Tex.Civ.App.1973), *rev'd on other grounds,* 514 S.W.2d 899 (Tex.1974). Removal is particularly appropriate in those cases where the offending party knowingly violated the covenant. Hecke, *Injunctions to Remove or Remodel Structures Erected in Violation of Building Restrictions,* 32 Texas L.Rev. 521 (1954).

In *Coleman v. Forister, supra,* at pp. 533–4, an encroachment case, this Court discussed the considerations involved in the issuance of a mandatory injunction to remove a structure:

"When one builds a structure on another's property, the owner can either treat the encroachment as a permanent trespass, and sue for damages, or pray for an injunction compelling its removal. If the encroachment has been intentional and if the trespasser has been grossly negligent in ascertaining the correct property line, most courts will grant a mandatory injunction for removal. To the contrary, most courts will refuse an injunction when the encroachment is slight and unintentional, the cost of removing it great and the corresponding benefit to the owner is small, or when full compensation can be given in damages. 32 Texas L.Rev. 602 (1945).

Though, in general, discouraging the use of mandatory injunctions for the removal of encroaching structures, Dean Page Keeton and Clarence Morris have written, 'Generally courts do issue a mandatory injunction requiring the removal of an encroachment when the defendant has intentionally got out of his own bounds. This seems defensible since the plaintiff's property interest is vindicated and the misbehaving defendant is punished if the removal is costly.' "

■ Many of the same considerations should be weighed in cases involving injunctions to remove structures in violation of building restrictions. *Coleman v. Forister, supra.* Applying those considerations to the facts in this appeal, this Court is of the opinion that entry of the injunction for removal was proper. Appellants with full knowledge and appreciation of the risks involved in the pending litigation deliberately continued construction of their residence. Although the cost of removal may be large, appellants could have minimized the loss by refraining from construction until the litigation was terminated. Points nine and ten are overruled.

■ Under point of error six, appellants argue that appellees Austin Corporation and David B. Barrow have no standing to enforce the restrictive covenant since neither owned property in Northwest Hills, Section Seven Addition, at trial time. Where the original owner and subdivider have conveyed away title to all lots in the subdivision, those parties have no right to enforce the restrictive covenants. *Spradley v. Whitehall,* 314 S.W.2d 615 (Tex.Civ.App. 1958, no writ). Appellants' argument is well taken, and the judgment will be reformed to eliminate the injunctive relief afforded appellees Austin Corporation and David B. Barrow.

Although appellants' major points have been discussed in this opinion, appellants have other points of error. Such points have been considered, all are without merit, and all are overruled.

The judgment of the district court is reformed so as to eliminate the injunctive relief afforded appellees Austin Corporation

and David B. Barrow. In all other respects, the judgment is affirmed.

Reformed, and as Reformed, Affirmed.

SMITH, Justice, concurring.

This case was originally before this Court on an appeal from the refusal of the trial court to grant a temporary injunction. *Huey v. Davis*, 556 S.W.2d 860 (Tex.Civ. App.1977), *rev'd*, 571 S.W.2d 859 (Tex.1978). The opinion by Associate Justice O'Quinn was very thorough and contained an in–depth examination of the law which is involved in this appeal. The opinion was so complete that the Supreme Court found it exceeded the limited issue then before this Court and had, in effect, prematurely decided the case on the merits. *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978).

The case was then tried in district court where the trial judge scrupulously followed the law as expressed by this Court in its original opinion.

We assume, *arguendo*, that the original opinion is not "the law of the case," because this Court was held by the Supreme Court to have exceeded the proper scope of review in not restricting its opinion to the narrow issue of abuse of authority by the trial court. 4 Tex.Jur.2d *Appeal and Error–Civil Cases*, Part 2, § 1004 (1974).

Nevertheless, the trial court properly respected and followed the original opinion and I conceive it to be our duty to follow the law as announced at that time and as now expressed in the present majority opinion.

Since I was not on this Court when the original opinion was handed down, my present position is not to be construed as either approving or disapproving the opinions expressed in the original opinion or in the dissent now expressed by Chief Justice Phillips. It is my conviction that, in the interest of the orderly administration of justice, we must now affirm the judgment of the trial court.

PHILLIPS, Chief Justice.

I respectfully dissent.

The developer claims paragraph eight set out in the Court's opinion as his authority to disapprove the Davises' plans. Essentially, his testimony, and appellees' argument, is that Northwest Hills has been developed pursuant to a general plan or scheme to insure a residential area of "high standards," and that appellants' placement far back on the lot would not be compatible with the area. There is no evidence that the Davis house would not be constructed of the "highest standards."

The question for our determination is whether paragraph number eight can justify restrictions as to setback more burdensome than those contained in the seventh paragraph also set out in the Court's opinion. I would hold that it cannot.

The trial court submitted two special issues to the jury. The first was: "Do you find from a preponderance of the evidence that the developer of Northwest Hills, in refusing to approve the Davis plans and plot plan, acted reasonably and in pursuance of a general plan or scheme to insure the development of the subdivision as a residential area of higher standards?" The answer was: "We do."

The other special issues submitted was: "Do you find from a preponderance of the evidence that the only reason considered by the developer in refusing to approve the Davis' plans and plot plan was the effect of the Davis' house upon the view from the Huey house?" The answer was: "We do not."

Along with the jury's answers to special issues, the trial court also filed findings of fact and conclusions of law. The court found that the developer is "entitled to refuse plans and plot plans provided he acts in good faith and has reasonable grounds which help insure the development of the subdivision as a residential area of high standards."

When restrictive covenants are imposed pursuant to a general scheme or plan, and the elements of the plan are secured by covenants embodying the restrictions, the

covenants are valid and binding on the developer and all purchasers of lots. *Huey v. Davis*, 556 S.W.2d at 863; *Curlee v. Walker*, 112 Tex. 40, 244 S.W. 497 (1922). We are still in agreement with this general principle.

In disapproving plans because they do not conform to a general plan or scheme, the developer must act in good faith, and be able to specify the reason for disapproval. This is so because of the general rule that restrictions are construed strictly in favor of the grantee and against the grantor and in favor of the free and unrestricted use of the land. *MacDonald v. Painter*, 441 S.W.2d 179 (Tex.1969). If the developer is able to show by the evidence that a general plan or scheme was adopted, and further demonstrates that *approval was denied because of a deviation from the general scheme*, then the developer's action will not be disturbed.

Keeping in mind the general theory stated above, I have reviewed the evidence and am convinced that the only reason that approval was denied in this case was due to the proposed placement of the Davises' house on their lot. David Barrow, one of the developers, repeatedly testified that the plans would have been approved were it not for the placement of the house. He said that the design, materials and the appearance of the house were in conformity with a residential area of high standards, and that the only problem with the house was "the position of it." There is no evidence that appellants deviated in any manner from a general plan or scheme, with the possible exception of placement, which will not justify disapproval in this case.

Paragraph seven of the restrictive covenants contains specific restrictions as to the placement of the house on the lot. The Davises conformed to those limitations. I would conclude that the eighth paragraph cannot justify restrictions as to placement which cancel out the specific restrictions of the seventh paragraph.

In *Johnson v. Dick*, 281 S.W.2d 171 (Tex. Civ.App.–San Antonio 1955, no writ), an architectural control committee set aside the requirements of a restrictive covenant by *decreasing* the setback restriction. Speaking of the authority of the committee, the court stated, "While it is authorized to determine whether or not a proposed structure complies with the general scheme of development adopted for the subdivision, it is not empowered to write new restrictive covenants, nor to cancel out and obliterate existing ones." 281 S.W.2d at 175.

The leading case of *Hannula v. Hacienda Homes*, 34 Cal.2d 442, 211 P.2d 302 (1949), which was cited in this Court's previous opinion, also stands for the proposition that the developer may deny permission only where there are no other specific restrictions which could provide a framework within which the right to approve plans could be said to be confined.

By ordering the Davises to build their home eighteen feet further from the rear line and four feet further from the Huey residence, the developer was necessarily varying the minimum setbacks of paragraph seven, and placing a more burdensome restriction on the Davises' use of their land. To hold otherwise would be in contradiction of the well–recognized principle that restrictive covenants are construed strictly against the grantor and in favor of the free use of the land. *MacDonald v. Painter, supra; Johnson v. Wellborn*, 181 S.W.2d 839 (Tex.Civ.App.–San Antonio 1944, writ ref'd w. o. m.).

Another case directly on point is *Bass v. Helseth*, 116 Cal.App.2d 75, 253 P.2d 525 (Cal.App.1953).[1] Here one restrictive covenant gave a free right of approval to the developer and another covenant contained specific provisions as to location of the buildings on the lots. The court held that

---

1. Also in accord is *Lushing v. Riviera Estates Association*, 196 Cal.App.2d 687, 16 Cal.Rptr. 763 (1961) (holding that where restrictions themselves give definition to building site, developer cannot add to that definition).

the covenant giving a free right of approval could not justify restrictions more burdensome than those contained in another covenant.

Consequently, the answers to special issues numbers 1 and 2 will not support a judgment in this case.

I would hold that the developer exceeded his authority in disapproving the Davises' plans because to do so burdened the Davises' use of their land beyond the restrictions of paragraph seven.

I would reverse the judgment of the trial court and render judgment dissolving the permanent injunction.